934 A.2d 1199

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Joseph RUSSO, Jr., Appellant.**

Supreme Court of Pennsylvania.

Submitted April 6, 2006.

Decided Nov. 20, 2007.

Andrew D. Bigda, Esq., Wilkes–Barre, for Joseph Russo, Jr.

George Paul Skumanick, Jr., Esq., for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## OPINION

Justice CASTILLE.*

We granted allowance of appeal in the instant case to determine whether, under Article I, Section 8 of the Pennsylvania Constitution, a landowner has a reasonable expectation of privacy against enforcement of Pennsylvania's Game Code in his open fields. Because we conclude that the Fourth Amendment open fields doctrine as enunciated by the United States Supreme Court in *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) applies equally under the Constitution of this Commonwealth, we affirm, albeit on different grounds, the order of the Commonwealth Court.

* This matter was reassigned to this author.

At 6:45 a.m. on November 25, 2002, nine minutes after the opening of Pennsylvania's bear-hunting season, appellant Joseph Russo, Jr., claimed to have killed a bear near his hunting cabin in Mehoopany Township, Wyoming County. Pursuant to Section 2323(a)(2) of the Game Code,[1] appellant transported the bear to the Game Commission station in Dallas for examination and tagging. Later that day, the Game Commission received a tip that appellant's hunting camp was "baited" in violation of Section 2308(a)(8) of the Game Code.[2] The information was relayed to Wildlife Conservation Officer (hereinafter "WCO") William Wasserman, who, in turn, directed Deputy WCO William Jeffrey Pierce to go to appellant's camp to investigate.[3]

Upon arriving after dark at approximately 6:00 p.m., WCO Pierce found appellant's camp apparently unoccupied. Appellant's property was clearly posted with "No Trespassing" signs. After parking his truck, Officer Pierce stepped over a

1. Section 2323(a)(2) of the Game Code provides that, "[i]n any year in which the commission establishes check stations, each person shall, within 24 hours after killing any big game, present the big game for examination and tagging." 34 Pa.C.S. § 2323(a)(2). Section 102 of the Game Code defines "big game" as "includ[ing] the elk, the whitetail deer, the bear and the wild turkey." 34 Pa.C.S. § 102.

2. Section 2308(a) of the Game Code provides, in pertinent part, as follows:

   § 2308. Unlawful devices and methods
   (a) General rule.—Except as otherwise provided in this title, it is unlawful for any person to hunt or aid, abet, assist or conspire to hunt any game or wildlife through the use of:

   *　　*　　*　　*　　*　　*

   (8) Any artificial or natural bait, hay, grain, fruit, nut, salt, chemical, mineral or other food as an enticement for game or wildlife, regardless of kind and quantity, or take advantage of any such area or food or bait prior to 30 days after the removal of such material and its residue. . . .

   *　　*　　*　　*　　*　　*

   34　Pa.C.S. § 2308(a).

3. Section 901(a)(2) of the Game Code (entitled, "powers and duties of enforcement officers") vests in "[a]ny officer whose duty it is to enforce this title or any officer investigating any alleged violation of this title" the "power and duty" to, inter alia, enter "any land or water outside of buildings, posted or otherwise, in the performance of the officer's duties." 34 Pa.C.S. § 901(a)(2).

cable across the driveway and walked approximately six hundred feet toward appellant's cabin until he observed, in plain view, an eight- by ten-foot pile of "apple mash"[4] located about ninety feet from the cabin. The officer also noticed in the apple mash a large indentation consistent with a bear having lain there, a clearly identifiable bear paw print, and leaves with blood droplets. Officer Pierce called Officer Wasserman and informed him of the bait pile. Pursuant to Officer Wasserman's instructions, Officer Pierce seized the bloody leaves as evidence. Continuing his investigation, Officer Pierce discovered a second pile of apple mash as well as a corn feeder approximately one hundred fifty yards from appellant's cabin. Finally, Officer Pierce returned to his vehicle and drove down a dirt road about four hundred yards into the woods.[5] After parking his truck, the officer got out and found what he recognized as bear entrails. Although the rest of the body was not at the location, an examination of the entrails revealed that the bear had recently eaten corn and mashed apples. The officer then seized the bear's stomach and its contents as evidence.

Meanwhile, once Officer Pierce had informed him of the bait pile, Officer Wasserman contacted Officer James Jolley, a WCO stationed in Luzerne County, where appellant maintained his residence. Officers Wasserman and Jolley, accompanied by two deputy WCOs, proceeded to appellant's home in Pittston. Upon pulling into appellant's driveway, the officers

4. As Officer Pierce subsequently testified: "It looks like somebody took apples and put them through some type of a crushing machine or a blender or something like that. It's just like mashed potatoes only with a heavier consistency. You can pick them up and like squish them in your hands. They're all mashed up." Notes of Testimony (N.T.), 3/31/04, at 7. The trial court found it "clear from the photographs taken the next day that the 'apple mash' is more correctly identified as pomace—that which remains after apples have been put through a cider press," i.e., "obviously ... not a naturally occurring phenomenon." Trial Ct. Op. at 2 n. 2.

5. There is no indication in the record that appellant owned the woods that Officer Pierce entered. In fact, the only relevant testimony suggests that appellant did not own these woods. See N.T., 3/31/04, at 59, 147. The parties, however, do not raise any issue relating to this fact, and thus it does not affect our disposition of the case.

observed a dead black bear carcass hanging from a piece of construction equipment. When the officers knocked on appellant's door, he answered and invited them in. In response to their questioning, appellant indicated that he was aware of the bait at his camp but asserted that the bear was not shot at either of the bait piles. The officers then seized the bear carcass as evidence and departed.

Officers Pierce and Wasserman returned to appellant's camp the next morning to take photographs and measurements and to gather additional evidence. At the first apple mash pile discovered by Officer Pierce, the officers found and seized a small piece of bear tissue. A forensic DNA analysis subsequently performed by the United States Fish and Wildlife Service established that all the blood and tissue recovered by the officers in the course of their investigation came from the bear whose carcass was seized at appellant's residence. Thereafter, appellant was charged with two summary violations of the Game Code: Unlawful Taking or Possession of Game or Wildlife, 34 Pa.C.S. § 2307; [6] and Unlawful Devices and Methods, 34 Pa.C.S. § 2308, *see supra.* After being found guilty of both offenses before a district judge, appellant appealed to the Court of Common Pleas of Wyoming County.

Prior to trial *de novo* before President Judge Brendan J. Vanston, appellant filed a motion to suppress the evidence seized by Officers Pierce and Wasserman, challenging the legality of their entry onto and search of his property under Article I, Section 8 of the Pennsylvania Constitution. On March 31, 2004, the trial court held a suppression hearing, which the court consolidated with appellant's trial *de novo*, and denied the motion. Officers Pierce and Wasserman testified for the Commonwealth, describing in detail the course of the investigation they conducted on November 25 and 26, 2002. Appellant's case-in-chief consisted primarily of the testimony

6. Section 2307(a) of the Game Code provides that "[i]t is unlawful for any person to aid, abet, attempt or conspire to hunt for or take or possess, use, transport or conceal any game or wildlife unlawfully taken or not properly marked or any part thereof, or to hunt for, trap, take, kill, transport, conceal, possess or use any game or wildlife contrary to the provisions of this title." 34 Pa.C.S. § 2307(a).

of his neighbor to the effect that apple trees were located on land near appellant's property. At the conclusion of the trial, the court convicted appellant of the two offenses and ordered him to pay $1,000 in fines, $2,599.87 in restitution, and the costs of prosecution.

The trial court found "[b]ased on the testimony of the officers and the photographic evidence presented" that "the nearest bait pile is not within the curtilage of [appellant's] cabin." Trial Ct. Op. at 5. Consequently, the court rejected appellant's argument that Article I, Section 8 prohibited the officers' warrantless search of the fields where the bait piles were found. "To rule otherwise," the court reasoned, "would emasculate the enforcement of the Game Code on any privately owned realty, as one would only have to post 'no trespassing' signs to keep out the game wardens." *Id.* The court stated that such a result would be absurd and a result that the constitutional framers surely did not intend. Appellant appealed to the Commonwealth Court, pursuing his suppression claim.

On January 7, 2005, a three-judge panel of the Commonwealth Court unanimously affirmed the order of the trial court. *Commonwealth v. Russo*, 864 A.2d 1279 (Pa.Cmwlth. 2005). In a published opinion authored by the Honorable Renée Cohn Jubelirer, the court held that, under Article I, Section 8 of the Pennsylvania Constitution, appellant did not have a reasonable expectation of privacy in the property upon which the bait piles were found. The court began and ended its analysis with appellant's argument that the "No Trespassing" signs that he posted created a reasonable expectation of privacy in the property. Thus, the court noted that a person does not commit trespass if he is "licensed or privileged to ... enter[ ][the] place as to which notice against trespass is given." *Id.* at 1284 (quoting 18 Pa.C.S. § 3503(b)(1)(ii) (defining the offense of criminal trespass) (emphasis omitted)). Turning to the Game Code, the court observed that Section 901(a)(2) specifically authorizes a WCO to "go upon any land or water outside of buildings, **posted or otherwise,** in the performance of the officer's duty." *Id.* (quoting 34 Pa.C.S.

§ 901(a)(2)). Therefore, the court concluded, "[appellant]'s posting of the signs cannot form the basis of a reasonable expectation of privacy[ ] [because] it would be unreasonable for him to expect that game officers, who are privileged to enter the land, would not do so to assure compliance with the Game Law." *Id.* at 1285. Indeed, the Commonwealth Court agreed with the trial court's observation that, otherwise, "criminals could very easily carry on illegal enterprises by merely placing 'No Trespassing' signs around the perimeter of their property." *Id.* Finally, in a footnote, the court noted the Commonwealth's reliance on the open fields doctrine as set forth in *Oliver, supra,* but determined that it was unnecessary to decide whether the doctrine applied under the Pennsylvania Constitution because of the court's holding in the case. *Id.* at n. 13.

Appellant petitioned this Court for allowance of appeal. On November 22, 2005, we granted appellant's petition and directed the parties to address the following issue: "Whether 34 Pa.C.S. § 901(a)(2) is unconstitutional because Article I, Section 8 of the Pennsylvania Constitution provides a landowner with a reasonable expectation of privacy in his posted property." *Commonwealth v. Russo,* 585 Pa. 1, 887 A.2d 1212 (2005).

Our standard of review of a trial court's denial of a suppression motion is well established:

> [W]e may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Boczkowski,* 577 Pa. 421, 846 A.2d 75, 89 (2004). An appellate court, of course, is not bound by the suppression court's conclusions of law. *Commonwealth v. Duncan,* 572 Pa. 438, 817 A.2d 455, 459 (2003).

The open fields doctrine was first recognized by the U.S. Supreme Court in *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). In that case, while surveil-

ling the home of Hester's father (where Hester lived), two revenue officers observed Hester exit the house and hand a quart bottle to an individual whom the officers suspected to be attempting to purchase illegal bootleg whiskey. After the officers began pursuing the two men, they fled, Hester discarding a jug and his would-be customer the bottle. Thereafter, the officers recovered the vessels at an undisclosed distance from the house and determined them to contain "moonshine whisky, that is, whisky illicitly distilled." *Id.* at 58, 44 S.Ct. at 446. Hester claimed that the evidence was inadmissible under the Fourth Amendment because the officers seized it without a warrant.[7] In a brief opinion for a unanimous court, Justice Oliver Wendell Holmes, Jr., concluded that "[i]t is obvious that even if there had been a trespass, the [evidence] was not obtained by an illegal search or seizure." *Id.* Citing Blackstone's COMMENTARIES ON THE LAWS OF ENGLAND, Justice Holmes held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Id.* at 59, 44 S.Ct. at 446.

Sixty years later, in a 6–3 decision in *Oliver v. United States, supra,* the High Court "reaffirm[ed]" the vitality of the open fields doctrine as announced in *Hester. Oliver,* 466 U.S. at 178, 104 S.Ct. at 1741; *id.* at 176 n. 6, 104 S.Ct. at 1740 n. 6 (rejecting the notion that "subsequent cases discredited *Hester's* reasoning"). Turning its attention initially to the constitutional text, the *Oliver* Court noted that open fields are not "effects" within the meaning of the Fourth Amendment. Indeed, the Court observed, "[t]he Framers would have understood the term 'effects' to be limited to personal, rather than real, property." *Id.* at 177 n. 7, 104 S.Ct. at 1740 n. 7 (citing, as Justice Holmes did, Blackstone's COMMENTARIES, among other sources).

7. The Fourth Amendment exclusionary rule was adopted in 1914. *See Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

Even assuming one had a subjective expectation of privacy in his open fields, the *Oliver* Court went on to reason, such an expectation is not one that society would be prepared to recognize as reasonable:

> [O]pen fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or "No Trespassing" signs effectively bar the public from viewing open fields in rural areas. And both petitioner Oliver and respondent Thornton concede that the public and police lawfully may survey lands from the air.

*Id.* at 178, 104 S.Ct. at 1741–42.

Finally, the *Oliver* Court explicitly rejected the contention that the reasonableness of one's expectation of privacy in his open fields should be determined on an *ad hoc,* case-by-case basis:

> Under this approach, police officers would have to guess before every search whether landowners had erected fences sufficiently high, posted a sufficient number of warning signs, or located contraband in an area sufficiently secluded to establish a right of privacy.... The lawfulness of a search would turn on a highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions. The ad hoc approach not only makes it difficult for the policeman to discern the scope of his authority; it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced.

*Id.* at 181–82, 104 S.Ct. at 1743 (citations and quotation marks omitted). In this regard, the Court specifically

reject[ed] the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate. It is true, of course, that petitioner Oliver and respondent Thornton, in order to conceal their criminal activities, planted the marihuana upon secluded land and erected fences and "No Trespassing" signs around the property. And it may be that because of such precautions, few members of the public stumbled upon the marihuana crops seized by the police. Neither of these suppositions demonstrates, however, that the expectation of privacy was legitimate in the sense required by the Fourth Amendment. The test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.

*Id.* at 182–83, 104 S.Ct. at 1743 (footnote omitted).

■■ There can be no question that the search *sub judice* was lawful under the Fourth Amendment, given the open fields doctrine.[8] The issue, however, is whether Pennsylvania has departed, or should depart, from that doctrine when applying Article I, Section 8 of our Constitution. To determine whether the open fields doctrine as enunciated in *Oliver* is consonant with Article I, Section 8, we will undertake an independent analysis of that provision as guided by our seminal decision in *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991). Under *Edmunds,* a principled consideration of state constitutional doctrine should include an examination of: (1) the text of the provision of our Constitution; (2) the history of the provision, including the caselaw of this Commonwealth; (3) relevant caselaw from other jurisdictions; and (4) policy considerations, "including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Edmunds,* 586 A.2d at 895. Consistently with *Edmunds,* appellant has dutifully discussed the four

8. Appellant does not argue that any of the evidence he seeks to suppress was seized within the curtilage of his hunting cabin.

factors in his brief, whereas the Commonwealth fails even to cite our decision in that case.[9]

## 1. Text

We begin our *Edmunds* analysis with a comparison of the language of Article I, Section 8 to that of the Fourth Amendment. The Fourth Amendment of the U.S. Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, Article I, Section 8 of the Pennsylvania Constitution provides as follows:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

█ Given the textual similarity between the two provisions, it is not surprising that appellant fails to make any textually based arguments for departing from the federal open fields doctrine. Like the word "effects" in the Fourth Amendment, "possessions" appears as the last among four objects in which the people have a right to be secure, the others being their "persons," "houses," and "papers." Pursuant to the interpretative doctrine of *ejusdem generis*, the term "possessions" should be construed in light of the particular words preceding it, all of which refer to intimate things about one's

---

9. The argument section of appellant's brief consists entirely of his *Edmunds* analysis notwithstanding this Court's direction when granting allowance of appeal that the parties also discuss the constitutionality of 34 Pa.C.S. § 901(a)(2). Because we hold that the officers' actions in this case did not violate appellant's rights under Article I, Section 8, we need not reach the constitutionality of the statute.

person.[10]  If "possessions" had been intended to refer to everything one owned, such as open fields, then there would have been no need to specify the other three objects.  We therefore find persuasive for present purposes the *Oliver* Court's interpretation of the text of the Fourth Amendment. Nothing in the plain text of Article I, Section 8 suggests that open fields are entitled to the same degree of privacy as one's person, house, papers, and possessions.

## 2.  History

Turning to the history prong of the *Edmunds* analysis, appellant generally observes that in the past decades it has been stated that, unlike the Fourth Amendment, Article I, Section 8 was motivated by a desire to safeguard citizens' privacy.  Thus, appellant cites recent decisions in which this

10.  In his Dissenting Opinion, Mr. Chief Justice Cappy proposes a broader interpretation of "possessions," citing the decisions of this Court in *Commonwealth v. Brion*, 539 Pa. 256, 652 A.2d 287 (1994), *Commonwealth v. Melilli*, 521 Pa. 405, 555 A.2d 1254 (1989), and *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979).  None of those three decisions, however, included an *Edmunds* analysis—*Melilli* and *DeJohn* because they preceded *Edmunds*, and *Brion* because the 4–3 post-*Edmunds* majority ignored the *Edmunds* paradigm.  Further, it is notable that, with respect to Article I, Section 8 privacy, *Brion*, the **only** post-*Edmunds* case, merely repeated the familiar standard, *i.e.*: "To determine whether one's activities fall within the right of privacy, we must examine: first, whether [the defendant] has exhibited an expectation of privacy: and second, whether that expectation is one that society is prepared to recognize as reasonable." *Brion*, 652 A.2d at 288–89 (quoting *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81, 87 (1988)).  That, of course, is the same test for reasonable expectation of privacy that applies under the Fourth Amendment. *See, e.g., Commonwealth v. Millner*, 585 Pa. 237, 888 A.2d 680, 691–92 (2005).

Suffice it to say that neither *Melilli* nor *DeJohn* contained the sort of searching inquiry contemplated by *Edmunds*, and we are not disposed, at the present time, to disavow the supervening importance of *Edmunds*.

It is also notable that *Brion* involved the sanctity of the home, and in emphasizing that point, the *Brion* majority invoked *Commonwealth v. Shaw*, 476 Pa. 543, 383 A.2d 496 (1978) for the proposition that: "Upon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society." *Brion*, 652 A.2d at 289 (quoting *Shaw*, 383 A.2d at 499). *Shaw* was a case decided exclusively under the Fourth Amendment, not Article I, Section 8. *Brion*, then, was an Article I, Section 8 case entirely reliant upon Fourth Amendment principle.

Court has accorded greater protection under Article I, Section 8 in certain other, limited contexts. *See* Appellant's Brief at 11–12 (citing, *inter alia, Commonwealth v. Shaw,* 564 Pa. 617, 770 A.2d 295 (2001)) (requiring warrant for seizure of hospital-administered blood-alcohol content test results under Article I, Section 8 where warrant not required under Fourth Amendment) (lacking *Edmunds* analysis); *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769 (1996) (holding that police pursuit of individual is a "seizure" within meaning of Article I, Section 8 even though it is not under Fourth Amendment) (applying *Edmunds* ); *Commonwealth v. White,* 543 Pa. 45, 669 A.2d 896 (1995) (rejecting federal rule allowing warrantless search of vehicle when incident to arrest) (lacking *Edmunds* analysis and characterizing it as *dicta* ). Appellant, however, fails to explain how the instant case implicates the heightened privacy interest recognized in these other contexts, nor does he draw our attention to any case that is remotely analogous to the one at bar. Indeed, a sufficient rebuttal to appellant's argument in this regard would be to point to the many decisions in which this Court has held that Article I, Section 8 does not afford greater protection than the Fourth Amendment. *See, e.g., Commonwealth v. Duncan,* 572 Pa. 438, 817 A.2d 455 (2003) (lack of privacy right in one's name and address); *Commonwealth v. Glass,* 562 Pa. 187, 754 A.2d 655 (2000) (anticipatory search warrants); *Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427 (1999) (voluntariness of consent to search); *Commonwealth v. Waltson,* 555 Pa. 223, 724 A.2d 289 (1998) (particularity requirement for warrants); *Commonwealth v. Williams,* 547 Pa. 577, 692 A.2d 1031 (1997) (warrantless parole searches); *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226 (1996) ("stop and frisk" under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ Taking a broader and more fundamental historical examination, it is worth noting that, at the time the U.S. Supreme Court determined that the Fourth Amendment and the then-recent federal exclusionary rule did not apply to open fields, the unbroken, prevailing interpretation of Article I, Section 8 by the Pennsylvania courts was that that provision

offered no exclusionary remedy whatsoever. Indeed, notwithstanding that the federal exclusionary rule had been in existence since the 1914 decision in *Weeks, supra,* this Court, and the Superior Court enforcing our decisions, repeatedly refused to find a similar remedy encompassed in Article I, Section 8. Instead, this Court's historical interpretation of Article 1, Section 8 always followed "the fundamental principle of the common law that the admissibility of evidence is not affected by the illegality of the means by which it was obtained." *Commonwealth v. Chaitt,* 380 Pa. 532, 112 A.2d 379, 381 & n. 1 (1955) (collecting cases); *Commonwealth v. Agoston,* 364 Pa. 464, 72 A.2d 575, 585 (1950); *Commonwealth v. Hunsinger,* 290 Pa. 185, 138 A. 683 (1927); *Commonwealth v. Dabbierio,* 290 Pa. 174, 138 A. 679, 681 (1927); *Commonwealth v. Montanero,* 173 Pa.Super. 133, 96 A.2d 178 (1953); *Commonwealth v. Dugan,* 143 Pa.Super. 383, 18 A.2d 84 (1941). The exclusionary rule itself, then, was not an organic part of Article I, Section 8; it was a federal imposition, made applicable against the states for Fourth Amendment purposes by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Thus, any historical survey respecting open fields and privacy under Article I, Section 8, like examination of **any** suppression case under the Pennsylvania charter, hits a brick wall in 1961: there is **no** relevant history to support a broader state constitutional interpretation because there was no point in seeking such an interpretation, at least in a criminal case, since there was no exclusionary remedy available.

Matters changed after *Mapp,* of course, and Pennsylvania courts, having become familiar by necessity with the command and operation of the federal exclusionary rule, began to entertain equivalent claims under the guise of Article I, Section 8. The progression was not consciously announced or explained, and indeed, in many instances, such disclosure was unimportant because this Court, while citing both the Fourth Amendment and Article I, Section 8, employed a coterminous approach. *See, e.g., Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963); *Commonwealth v. Eazer,* 455 Pa. 320, 312 A.2d 398 (1973); *Commonwealth v. White,* 459 Pa. 84, 327

A.2d 40 (1974); *Commonwealth v. Brooks*, 468 Pa. 547, 364 A.2d 652 (1976); *Commonwealth v. Holzer*, 480 Pa. 93, 389 A.2d 101 (1978). Eventually, however, exclusionary decisions arose that were rendered exclusively under Article I, Section 8, and other decisions were so rendered while recognizing that the course taken represented a break from U.S. Supreme Court authority, and an embrace of a greater protection of privacy rights than that which was commanded under the Fourth Amendment and *Mapp*. See, e.g., *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979); *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983); *Edmunds, supra.* Even this development was not entirely clear, for **no** decision of this Court has squarely purported to examine and disapprove of the long and unbroken line of pre-*Mapp* decisions holding that, far from recognizing greater exclusionary-rule-related privacy rights, Article I, Section 8 contained no exclusionary remedy whatsoever.

Our decisional task in this case, however, does not require us to explain and synthesize this Court's pre- and post-*Mapp* expressions concerning Article I, Section 8. The reality is that, in the past few decades, a substantial body of cases has arisen under Article I, Section 8, all involving the exclusionary remedy. Some holdings have been explained with an *Edmunds* analysis, *see, e.g., Edmunds,* while others contain holdings that are unexplained in *Edmunds* terms, *see, e.g., Commonwealth v. Shaw*, 564 Pa. 617, 770 A.2d 295 (2001); *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1995); *Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251 (1993); *Commonwealth v. Hess*, 532 Pa. 607, 617 A.2d 307 (1992).[11] What is most

---

11. The Dissenting Opinion of the Chief Justice recognizes the mandatory nature of the analysis set forth in *Edmunds. See* Op. at 144, 934 A.2d at 1214 ("A determination of whether *Oliver* comports with the rights guaranteed Pennsylvania citizens under Article I, Section 8 of the Pennsylvania Constitution **requires** an examination of the four factors set forth in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991).") (emphasis added). We agree that state constitutional decisions are more secure when they proceed from a searching inquiry. Madame Justice Baldwin's Dissenting Opinion posits that *Edmunds* exists solely to encourage litigants to provide *Edmunds* information in briefing, does not require that the Court's thought processes in render-

ing a state constitutional holding be made explicit, and places a burden upon litigants, not on the courts.

*Edmunds* noted the reason that it is important for litigants to brief the factors announced in that decision is to facilitate the requirement that Pennsylvania courts "make a 'plain statement' of the adequate and independent state grounds upon which we rely, in order to avoid any doubt that we have rested our decision squarely upon Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 895. *Edmunds* having been the case where the four-part inquiry was established, the Court did not have the benefit of such briefing from the parties. Nevertheless, the Court did not simply announce its Article I, Section 8 holding there; rather, it engaged in the searching inquiry the four-part test contemplated.

Although it is true that the Court has rendered decisions since *Edmunds* which were not accompanied by an *Edmunds* analysis, and even in cases where the parties failed to brief *Edmunds*, there also are numerous, careful state constitutional decisions where **this Court** has engaged in the responsible, searching inquiry *Edmunds* outlined. *See Commonwealth v. Glass*, 562 Pa. 187, 754 A.2d 655, 661 (2000) (challenge to anticipatory search warrant) (characterizing *Edmunds* as "the four-part methodology to aid in evaluating state constitutional claims"); *Commonwealth v. Cleckley*, 558 Pa. 517, 738 A.2d 427, 430 (1999) (applying *Edmunds* to assess validity of consent search under Pennsylvania Constitution); *Commonwealth v. Waltson*, 555 Pa. 223, 724 A.2d 289, 291 (1998) (challenge that warrant was overbroad) ("In *Commonwealth v. Edmunds*, this court proffered a methodology for analyzing issues which arise pursuant to the Pennsylvania Constitution.") (citation omitted); *Commonwealth v. Hawkins*, 553 Pa. 76, 718 A.2d 265, 266, 268 (1998) (applying *Edmunds* analysis to Article I, Section 8 claim that criminal defendants "should be able to vicariously assert privacy interests belonging to others in order to challenge allegedly intrusive police conduct") ("When asked to decide whether our state Constitution provides greater privileges and protections than the United States Constitution, we evaluate the request in light of the [four *Edmunds* factors]."); *Commonwealth v. Williams*, 547 Pa. 577, 692 A.2d 1031, 1038 (1997) (parolee search) ("When determining whether the Pennsylvania Constitution provides greater protection than its counterpart in the federal constitution, this Court considers the [four *Edmunds* factors.]"); *Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769, 772 n. 3 (1996) (applying *Edmunds* in determining scope of seizure under Article I, Section 8; declining to follow *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)) ("In *Edmunds*, this Court created a four-pronged methodology to aid in the analysis of state constitutional claims. This methodology, while not mandatory, highlights important touchstones that should be considered whenever this Court weighs the impact of United States Constitutional decisions upon state constitutional claims."); *accord Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350, 358 (1998) (Opinion Announcing Judgment of Court) (school searches) (noting that "we developed in [*Edmunds* ] a four pronged methodology that we will follow in addressing the applicability of [U.S. Supreme Court Fourth Amendment authority] to the constitutionality of school searches in Pennsylvania").

important for present purposes, however, is that our own unique history and caselaw simply do not reflect any "societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields." *Oliver*, 466 U.S. at 179, 104 S.Ct. at 1741. As the *Oliver* Court observed, a notation with which we agree, these lands are, as a practical matter, readily accessible to the public and to law enforcement. *Id.* Thus, in Pennsylvania, as in almost every other state, open fields do not provide the setting for the kinds of intimate activities with respect to which citizens would reasonably expect to be free from governmental surveillance. Article I, Section 8's protection of privacy has been in existence for over two hundred years, and yet, there has never been any suggestion, in any Pennsylvania source, that would militate a contrary conclusion. In fact, the decisions of the courts of this Commonwealth that are most analogous reflect a recognition of the distinction between the home and open fields when determining the legitimacy of one's expectation of privacy under Article I, Section 8. *See Commonwealth v. Rood*, 686

Moreover, this Court has applied the *Edmunds* methodology in considering state constitutional claims under provisions other than Article I, Section 8. *See, e.g., Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591, 603 (2002) (freedom of expression under Article I, Section 7 of Pennsylvania Constitution) ("We also agree with the parties that it is helpful to conduct our Pennsylvania constitutional analysis, to the extent possible, consistently with the model suggested by *Edmunds.*") (noting also that, although *Edmunds* involved Article I, Section 8, the decision "spoke to the appropriate analysis of Pennsylvania constitutional claims as a class"); *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143, 147 (2001) (Opinion Announcing Judgment of Court) (applying *Edmunds* to multi-faceted state constitutional claim challenging statute permitting admission of victim impact testimony at penalty phase of capital trial); *Commonwealth v. Swinehart*, 541 Pa. 500, 664 A.2d 957, 958 (1995) (evaluating whether use and derivative use immunity provided in 42 Pa.C.S. § 5947 was consistent with Article 1, Section 9's privilege against compelled self-incrimination) ("We find that the four-pronged method of analysis established in *Edmunds* to be the most thorough manner of accomplishing our task.") (applying *Edmunds* where challenger failed to provide *Edmunds* analysis); *United Artists' Theater Circuit, Inc. v. City of Philadelphia*, 535 Pa. 370, 635 A.2d 612, 615 (1993) (applying *Edmunds* to state constitutional claim sounding in Takings Clause of Article I, Section 10).

We reiterate that we believe that state constitutional decisions are more secure when they are supported by the searching inquiry contemplated by *Edmunds*.

A.2d 442, 450 (Pa.Cmwlth.1996) (*en banc*), *alloc. denied,* 548 Pa. 683, 699 A.2d 736 (1997) (holding that landowner had no reasonable expectation of privacy under Article I, Section 8 in outdoor wooded area beyond curtilage of his home); *Commonwealth v. Treftz,* 465 Pa. 614, 351 A.2d 265, 270 (1976) (noting, in holding that defendant lacked standing to challenge seizure of corpse of murder victim under Article I, Section 8, that corpse was found in backwoods area accessible to hunters); *see also Commonwealth v. Bender,* 811 A.2d 1016, 1023 (Pa.Super.2002) (rejecting Article I, Section 8 challenge to admissibility of tape recording made "not ... inside of [defendant's] home[ but] [r]ather, ... at some location outside the four walls of [defendant's] residence and then continu[ing] exclusively within ... vehicle" parked on defendant's property).

Appellant ably summarizes this Court's general observations in *Edmunds* regarding the unique history of Article I, Section 8. Missing from appellant's analysis, however, is an attempt to relate that unique history to the specific question of the reasonableness of an expectation of privacy in one's open fields. *Compare with Edmunds,* 586 A.2d at 899 (addressing propriety of "good-faith" exception to exclusionary rule in light of unique history of Article I, Section 8). The mere fact that this Court has, under certain circumstances, accorded greater protections to the citizens of this Commonwealth under Article I, Section 8 "does not command a reflexive finding in favor of any new right or interpretation asserted. To the contrary, we should apply the prevailing standard where our own independent state analysis does not suggest a distinct standard." *Commonwealth v. Glass,* 562 Pa. 187, 754 A.2d 655, 660 (2000) (citation and internal quotation marks omitted). Appellant fails to suggest any aspect of the unique history of Article I, Section 8 that would put the lie to the "old as the common law" distinction between house and open fields that Justice Holmes invoked in *Hester,* an observation that, as author of the classic, THE COMMON LAW, Justice Holmes was supremely well positioned to make. Pennsylvania history, in short,

weighs strongly against any notion that open fields are entitled to the same heightened privacy as one's person or home.

### 3. Other jurisdictions

Consistently with guidance from *Edmunds*, we next consider relevant caselaw from other jurisdictions. In his brief, appellant discusses four decisions from our sister states that have refused to adopt the federal open fields doctrine for purposes of their constitutions. First, appellant cites *People v. Scott*, 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328 (1992), in which the Court of Appeals of New York held that a landowner had a protectable privacy interest in land beyond the curtilage of his home under Article I, Section 12 of the New York constitution. As appellant notes, the text of the New York constitutional provision is substantially similar to that of Article I, Section 8 of our Constitution. *See* N.Y. Const. art. I, § 12 (protecting "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures"). Nevertheless, the *Scott* court expressly disavowed "the *Oliver* majority's ... literal textual analysis," instead preferring to focus on the compatibility of the federal open fields doctrine with New York caselaw. *Scott*, 583 N.Y.S.2d 920, 593 N.E.2d at 1335. Appellant fails to suggest that any of the New York decisions cited in *Scott* is consistent with the Article I, Section 8 jurisprudence of this Commonwealth. In fact, the New York decisions' emphasis on state trespass statutes is, if anything, contrary to Pennsylvania caselaw. *Compare People v. Gleeson*, 36 N.Y.2d 462, 369 N.Y.S.2d 113, 330 N.E.2d 72 (1975), cited in *Scott*, 583 N.Y.S.2d 920, 593 N.E.2d at 1336 (suppressing information obtained as a result of a "trespass" by sheriff) *with Rood*, 686 A.2d at 450 (noting that officer "was specifically authorized and, in fact, required by law to investigate the field and wooded area located on Rood's property" (citing former Section 741(2), now Section 901(a)(2), of the Game Code)).

■ Appellant next cites *State v. Johnson*, 75 Wash.App. 692, 879 P.2d 984 (1994) and *State v. Kirchoff*, 156 Vt. 1, 587

A.2d 988 (1991), in which the Court of Appeals of Washington and the Supreme Court of Vermont each determined that the federal open fields doctrine was incompatible with the respective provisions of those states' constitutions. Both the *Johnson* and *Kirchoff* courts noted, however, that the relevant general inquiry under their respective constitutions was not, as under the Fourth Amendment, the reasonableness of one's privacy expectation. *See Johnson*, 879 P.2d at 990 ("Unlike the inquiry into subjective and reasonable expectations of privacy that must be made when the Fourth Amendment is implicated, the critical inquiry under the Washington State Constitution focuses on ... [whether] the law enforcement officers unreasonably intrude[d] into the defendant's 'private affairs[.]' "); [12] *Kirchoff*, 587 A.2d at 995 (expressing "reluctan[ce] to use the phrase 'reasonable expectation of privacy' "). Conversely, "[i]n determining the scope of protection afforded under Article I, Section 8, this Court employs the same two-part test employed by the United States Supreme Court to determine the sweep of the Fourth Amendment of the U.S. Constitution." *Commonwealth v. Duncan*, 572 Pa. 438, 817 A.2d 455, 463 (2003). That test requires a person to demonstrate: (1) a subjective expectation of privacy; and (2) that the expectation is one "that society is prepared to recognize as reasonable and legitimate." *Id.* (quoting *Commonwealth v. Gordon*, 546 Pa. 65, 683 A.2d 253, 256 (1996)).

Finally, appellant cites *State v. Bullock*, 272 Mont. 361, 901 P.2d 61 (1995), in which the Supreme Court of Montana rejected the open fields doctrine for purposes of that state's constitution. In so holding, the *Bullock* court emphasized that the Montana constitution includes, in addition to its own counterpart to the Fourth Amendment, an additional provision not found in the federal Constitution. *Id.* at 75. Indeed,

12. The *Johnson* court explained the Washington courts' rejection of the federal standard as owing to the unique language of that state constitution's counterpart to the Fourth Amendment: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." *Wash. Const.* art. 1, § 7. The absence of such language in Article I, Section 8 of the Pennsylvania Constitution further detracts from appellant's reliance on *Johnson* as persuasive support in his *Edmunds* analysis.

Article II, Section 10 of the Montana Constitution provides that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Given the absence of any such provision in the Pennsylvania Constitution, we find *Bullock* unpersuasive in determining the compatibility of the federal open fields doctrine with Article I, Section 8.

As appellant responsibly notes, other states have adopted the federal open fields doctrine for purposes of their respective constitutional guarantees against unreasonable searches and seizures. The wording of the constitutional provisions of these states, unlike Montana and Washington, is substantially similar to that of Article I, Section 8 of our Constitution. *See, e.g., State v. Pinder,* 128 N.H. 66, 514 A.2d 1241, 1246 (1986) (adopting federal open fields doctrine under N.H. CONST. part I, art. 19); *State v. Havlat,* 222 Neb. 554, 385 N.W.2d 436, 440 (1986) (NEB. CONST. art. I, § 7); *Williams v. State,* 201 Ind. 175, 166 N.E. 663 (1929) (IND. CONST. art. I, § 11); *Wolf v. State,* 110 Tex.Crim. 124, 9 S.W.2d 350 (1928) (TEX. CONST. art. I, § 9); *State v. Zugras,* 306 Mo. 492, 267 S.W. 804, 806 (1924) (MO. CONST. art. II, § 11); *Ratzell v. State,* 27 Okla.Crim. 340, 228 P. 166, 168 (1924) (OKLA. CONST. Bill of Rights § 30); *Brent v. Commonwealth,* 194 Ky. 504, 240 S.W. 45, 48 (1922) (KY. CONST. § 10); *State v. Gates,* 306 N.J.Super. 322, 703 A.2d 696, 701 (1997) (N.J. CONST. art. I, ¶ 7); *Betchart v. Dep't of Fish & Game,* 158 Cal.App.3d 1104, 205 Cal.Rptr. 135 (1984) (CAL. CONST. art. I, § 13). For this reason, we find the decisions from these states more persuasive than the decisions from the four states upon which appellant relies.

## 4. Policy considerations

Appellant concludes his *Edmunds* analysis by referencing five policy considerations that he claims support his position. According to appellant, the guarantees of Article I, Section 8 should extend to open fields in order: (1) to prevent "overly zealous police officers" from conducting "fishing expeditions"; (2) to "protect [ ] the right of privacy"; (3) to prevent WCOs from "treat[ing] the property of others as their own"; (4) to

avoid confrontations between WCOs and landowners; and (5) to encourage WCOs to apply for search warrants. Appellant's Brief at 17–18.

In a recent scholarly article, our learned colleague Mr. Justice Thomas Saylor explained why "[i]mplementation of a state constitutional value ... necessarily entails a searching, evaluative inquiry" into genuinely "unique state sources, content, and context as bases for independent interpretation." Thomas G. Saylor, *Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged Prophylactic Rule*, 59 N.Y.U. ANN. SURV. AM. L. 283, 309–13 (2003). Indeed, were it otherwise, the tag-line "policy" could metamorphose into cover for a transient majority's implementation of its own personal value system as if it were an organic command. As support for his policy arguments, appellant cites general principles of Pennsylvania law, decisions from other states, and our trespass statute, 18 Pa.C.S. § 3502, without actually explaining how any of these authorities pertains to "unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 895. Appellant's reliance on authorities that either come directly from another state [13] or are indistinct from those of most other jurisdictions [14] merely highlights the absence of Pennsylvania sources to support his position. This argument falls short of the kind of searching inquiry required to determine that public policy considerations unique to Pennsylvania suggest that the federal open fields doctrine is inconsistent with Article I, Section 8 of our Constitution.

The citizens of this Commonwealth throughout our history have shown a keen interest in protecting and preserving as an asset the diverse wildlife that find refuge in the fields and forests within our borders. This interest is so strong that it is

13. *See* Appellant's Brief at 18 (quoting *Scott*, 583 N.Y.S.2d 920, 593 N.E.2d at 1336); *id.* (quoting *Johnson*, 879 P.2d at 993); *id.* at 19 (citing *Kirchoff*, 587 A.2d at 996–97).

14. *See, e.g.*, Appellant's Brief at 17 (citing *Commonwealth v. Glass*, 718 A.2d 804, 810 (Pa.Super.1998) for the proposition that the purpose of Article I, Section 8 is "to protect citizens from unreasonable searches and seizures"); *id.* at 19 (citing 34 Pa.C.S. § 3502).

enshrined by a separate provision of the Pennsylvania Constitution:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. 1, § 27. The legislative and executive branches, in turn, have enacted and executed a plethora of statutes and regulations designed to enforce the people's right to the preservation of our wildlife.[15] Thus, our Constitution and enacted statutes—as well as the agencies created to enforce them—all confirm that, in Pennsylvania, any subjective expectation of privacy against governmental intrusion in open fields is not an expectation that our society has ever been willing to recognize as reasonable. In short, the baseline protections of the Fourth Amendment, in this particular area, are compatible with Pennsylvania policy considerations insofar as they may be identified. More importantly, there is nothing in the unique Pennsylvania experience to suggest that we should innovate a departure from common law and from federal law and reject the open fields doctrine.

In light of the foregoing, we hold that the guarantees of Article I, Section 8 of the Pennsylvania Constitution do not extend to open fields; federal and state law, in this area, are coextensive.[16] Therefore, we affirm the Commonwealth Court's determination that Officers Wasserman and Pierce did

---

**15.** Enforcement, it is worth noting, is a monumental task. For every three hundred fifty square miles of land in Pennsylvania, only one full-time WCO is assigned to conduct wildlife protection. A WCO's duties include not just enforcing hunting and trapping laws but also investigating hunting accidents, conducting wildlife surveys, assisting in wildlife research projects, and providing educational programs. Pa. Game Comm'n, "About the Pennsylvania Game Commission," *at* ht tp://www. pgc.state.pa.us/pgc/cwp/view.asp?a=481 & q=151287 (last visited Nov. 19, 2007).

**16.** For this reason, the instant case does not require us to reach the constitutionality of 34 Pa.C.S. § 901(a)(2).

not violate appellant's right to be free from unreasonable searches and seizures.[17]

Affirmed.

Justice SAYLOR, EAKIN and FITZGERALD join the opinion.

Chief Justice CAPPY files a dissenting opinion in which Justice BAER and Justice BALDWIN join.

Justice BALDWIN files a dissenting opinion in which Justice BAER joins.

Chief Justice CAPPY, dissenting.

I respectfully and vigorously dissent. By adopting the open fields doctrine, the Majority today holds that a property owner has no constitutionally protected privacy interest in property outside his curtilage, regardless of whether he posted the property in a manner that unmistakably indicates that entry is not permitted. By so holding, the Majority has declined to rule on the precise issue for which we granted allocatur, *i.e.* the constitutionality of Section 901(a)(2) of the Game and Wildlife Code, 34 Pa.C.S. § 901(a)(2), which permits a Pennsylvania Game Commission Wildlife Conservation Officer to enter onto posted private property *without any level of suspicion and without a warrant.* Contrary to the Majority, I believe that application of the open fields doctrine is inconsistent with the protections afforded by Article I, Section 8 of the Pennsylvania Constitution. I would hold that Section 901(a)(2) is unconstitutional to the extent that it authorizes entry onto posted private property without any level of suspicion of illegal activity. I reach this conclusion because a constitutional rule which permits state agents to enter private land in outright disregard of the property owner's efforts to

17. As appellant notes, the Commonwealth Court failed to conduct an *Edmunds* analysis, preferring not to reach the applicability of the federal open fields doctrine under Article I, Section 8. Because we believe that the foundational constitutional question must be answered, we do not endorse the court's reasoning in reaching its conclusion.

maintain privacy is one that offends the fundamental rights of Pennsylvania citizens.

As noted by the Majority, the United States Supreme Court reaffirmed the validity of the open fields doctrine and clarified the doctrine's scope and applicability in *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The *Oliver* Court adopted a *per se* approach, holding that a property owner has no constitutionally protected interest in land outside the curtilage, regardless of the steps taken to assure privacy.[1] A determination of whether *Oliver* comports with the rights guaranteed Pennsylvania citizens under Article I, Section 8 of the Pennsylvania Constitution requires an examination of the four factors set forth in *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991). I shall briefly address each factor.

The first *Edmunds* factor concerns the text of the two constitutional provisions. Article I, Section 8, of the Pennsylvania Constitution declares that citizens "shall be secure in their persons, houses, papers and *possessions,*" while the Fourth Amendment to the United States Constitution secures

[1] Justice Thurgood Marshall filed a strong dissenting opinion in *Oliver,* which was joined by Justices William Brennan and John Paul Stevens. The Dissent initially disagreed with the literal interpretation of the text of the Fourth Amendment and the conclusion that real property is not included in the list of protected spaces and possessions. *Id.* at 186, 104 S.Ct. 1735. It reasoned that the Majority conceded that the curtilage of the home is protected by the Constitution without such term appearing in the text of the Amendment. Further, the Dissent noted that neither a public telephone booth nor a conversation conducted therein can fairly be described as a person, house, paper, or effect and yet the Court had granted Fourth Amendment protection over such activity in *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

The *Oliver* dissenters also disagreed with the conclusion that any interest a landowner might have in the privacy of his fields is not one that society is prepared to recognize as reasonable. 466 U.S. at 189, 104 S.Ct. 1735. They noted that the positive law recognizes the legitimacy of the landowners' expectation in posted land (*id.* at 191, 104 S.Ct. 1735); that privately owned woods and fields that are not exposed to public view are employed in a variety of ways that society acknowledges deserve privacy (*id.* at 192, 104 S.Ct. 1735); and that the claim to privacy was strengthened by the fact that the landowners took precautions to exclude the public, unlike the circumstances in *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). *Id.* at 193, 104 S.Ct. 1735.

the right of people to be secure in their "persons, houses, papers and *effects.*" The Majority concludes:

> Like the word "effects" in the Fourth Amendment, "possessions" appears as the last among four objects in which the people have a right to be secure, the others being their "persons," "houses," and "papers." Pursuant to the interpretative doctrine of *ejusdem generis,* the term "possessions" should be construed in light of the particular words preceding it, all of which refer to intimate things about one's person. If "possessions" had been intended to refer to everything one owned, such as open fields, then there would have been no need to specify the other three objects. We therefore find persuasive for present purposes the *Oliver* Court's interpretation of the text of the Fourth Amendment. Nothing in the plain text of Article I, Section 8 suggests that open fields are entitled to the same degree of privacy as one's person, house, papers, and possessions.

Op. at 1205–06.

I disagree. The Majority's interpretation of "possessions" as encompassing only intimate things about one's person does not comport with our previous case law in which we afforded a broad interpretation of Article I, Section 8. *See e.g. Commonwealth v. Brion,* 539 Pa. 256, 652 A.2d 287 (1994) (holding that Article I, Section 8 provides a constitutionally recognized expectation of privacy in conversations conducted in one's home); *Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989) (recognizing a constitutionally protected privacy interest under Article I, Section 8 in telephone numbers accessible by a telephone company); *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979) (holding that Article I, Section 8 protects a privacy interest in one's banking records). Conversations, telephone numbers, and bank records do not fall under a narrow construction of "persons, houses, papers and possessions," yet we have afforded them protection under certain circumstances pursuant to the text of Article I, Section 8.

I further note that Article I, Section 8 states that no warrant to search *"any* place" or to seize *"any* person or

things" shall issue without probable cause. This language, which does not appear in the Fourth Amendment, suggests that a property owner may possess a privacy interest in his land. Thus, I would find that Article I, Section 8 should be interpreted more broadly than the Fourth Amendment to offer greater protection.

Regarding the second factor of the *Edmunds* analysis, the history of the constitutional provision, the Majority reasons that notwithstanding Article I, Section 8's protection of privacy for over two hundred years, there has never been any suggestion in any Pennsylvania source that suggests a reasonable expectation of privacy in open fields. Op. at 136, 934 A.2d at 1209. Such lack of precedent from this Court may arise from the fact that there has never been a case in which the particular issue was presented. Surely the mere passage of time does not affect a citizen's ability to seek constitutional protection of an interest that has not yet been formally recognized as worthy of such protection. More important to the historical analysis is the fact that Article I, Section 8 is meant to *embody a strong notion of privacy* that has been carefully safeguarded in this Commonwealth for the past two centuries, *id.*, 586 A.2d at 897, whereas *the sole purpose* for the exclusionary rule under the Fourth Amendment is to deter police misconduct. *Id.* (citing *United States v. Leon*, 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677). Considering this rich history, I would interpret Article I, Section 8 as encompassing a right of privacy in property that is posted in a manner as to reasonably indicate that entry is not permitted.[2]

2. The Majority's implication that a historical analysis of Article I, Section 8, should only include matters occurring after the United States Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) is unfounded. The Majority declares that prior to 1961, "there is **no** relevant history to support a broader state constitutional interpretation because there was no point in seeking such an interpretation, at least in a criminal case, since there was no exclusionary remedy available." Op. at 133, 934 A.2d at 1207 (emphasis supplied). I respectfully submit that the fact that there was no exclusionary *remedy* is irrelevant to the historical import of the *right* to privacy as guaranteed by Article I, Section 8.

Turning to the third prong of the *Edmunds* analysis, related case law from other states, the Majority acknowledges that several jurisdictions have rejected the *per se* rule adopted in *Oliver* as inconsistent with the protections afforded under their state constitutions. *See Montana v. Bullock*, 272 Mont. 361, 901 P.2d 61 (1995); *People v. Scott*, 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328 (1992); *Oregon v. Dixson*, 307 Or. 195, 766 P.2d 1015 (1988); *State v. Kirchoff*, 156 Vt. 1, 587 A.2d 988 (1991); *State v. Johnson*, 75 Wash.App. 692, 879 P.2d 984 (1994).

I find the decision of *Montana v. Bullock* to be particularly persuasive because it is based on an interest that Pennsylvania and Montana share—a high regard for privacy. In *Bullock*, the Montana Supreme Court examined whether Article II, Section 11 of the Montana Constitution prohibits warrantless searches and seizures on private land that falls outside the curtilage of a dwelling. The court answered this inquiry in the affirmative and declined to adopt the open fields doctrine as set forth in *Oliver*.

Without permission or a search warrant, the law enforcement officers in *Bullock* entered a gate onto private property which had been posted with "No Trespassing" signs. The officers observed an elk hanging near the cabin and charged the defendants with game violations. In ruling that the lower court erred by failing to grant the defendants' motion to suppress, the court initially found that the *Oliver* decision improperly returned to the concepts discredited in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The court examined the decisions in *Dixson, Scott*, and *Johnson, supra*, and was convinced that Montana, like Oregon, New York, and Washington, had a strong tradition of respect for the right to individual privacy. 901 P.2d at 75. As evidence of such privacy interest, the *Bullock* court cited an additional provision contained in the Montana Constitution that states "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." MONT. CONST. Art. II, § 10.

The Majority finds *Bullock* unpersuasive based on this additional constitutional provision. Op. at 139–40, 934 A.2d at 1211. The Majority fails to recognize that the issue in *Bullock*, however, was the interpretation of Article II, Section 11 of the Montana Constitution, which contains language nearly identical to the Fourth Amendment. The *Bullock* court cited Article II, Section 10 of its constitution merely as an additional ground to demonstrate Montana's strong tradition for respect of individual privacy. The *Bullock* court stated:

> We conclude that in Montana a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this State is willing to recognize as reasonable, and that where that expectation is evidenced by fencing, "No Trespassing," or similar signs, or "by some other means [which] indicates unmistakably that entry is not permitted," entry by law enforcement officers requires permission or a warrant. As in our prior decisions, however, this requirement does not apply to observations of private land from public property.

901 P.2d at 75–6 (citations omitted).

This Commonwealth's respect of privacy is equally well-established as we have held that Article I, Section 8 embodies a strong notion of privacy that has been carefully safeguarded in this Commonwealth for centuries. *Edmunds*, 586 A.2d at 896. Accordingly, I am persuaded by the reasoning in *Bullock* and the decisions from those jurisdictions which have held that their state constitutions provide greater protection of citizens' privacy interests than that provided by the Fourth Amendment.

Finally, I believe that the last factor in the *Edmunds* analysis—policy considerations—weighs in favor of Appellant. Appellant contends, *inter alia*, that recognizing a privacy interest in property that is clearly posted as private supports the policy behind the use of search warrants, which is to protect citizens against unreasonable searches and seizures and to protect the right to be left alone. Appellant argues that recognizing such privacy interest would not handicap law enforcement because officers could still search property that is

not posted or fenced, could observe evidence of violations of the Game Code in plain view, or could obtain a warrant to search citizens' private property upon receipt of information that a violation of the Game Code has occurred. The Majority finds that this argument "falls short of the kind of searching inquiry required to determine that public policy considerations unique to Pennsylvania suggest that the federal open fields doctrine is inconsistent with Article I, Section 8 of our Constitution." Op. at 141, 934 A.2d at 1212. I cannot agree as I find Appellant's proffered policy considerations to be paramount. I appreciate the Game Officers' obligation to protect and preserve the game or wildlife of this Commonwealth, but I would nevertheless find that the delicate balance of competing interests falls on the side of protecting Pennsylvania citizens' privacy interests.

In summary, upon examination of the *Edmunds* factors, I conclude that the text of Article I, Section 8, its history in this Commonwealth, the related case law of other states, and the relevant policy considerations support constitutional protection of a Pennsylvania landowner's right to privacy when he or she has posted the property in a manner that indicates that entry is not permitted. Accordingly, I would hold that a citizen may claim privacy in an open field under Article I, Section 8 of the Pennsylvania Constitution when indicia would lead a reasonable person to conclude that the area is private. I would therefore find Section 901(a)(2) unconstitutional to the extent that it authorizes entry onto posted private property without any level of suspicion of illegal activity.

I am not convinced, however, that such conclusion entirely disposes of this case because the Game Officers possessed *some* level of suspicion when they entered Appellant's property as they received an anonymous tip that the property was baited and recognized that Appellant shot a bear within minutes of the opening of bear hunting season. Because the lower courts did not examine whether the Game Officers, as any other law enforcement officer, had authority, *independent of the statute at issue,* to approach the door of Appellant's cabin to investigate allegations that the property was baited

and to seize evidence obtained in plain view, I would remand the matter to the trial court to afford the parties a full and fair opportunity to address such issue.

Justice BAER and Justice BALDWIN join this dissenting opinion.

Justice BALDWIN, dissenting.

I join Chief Justice Cappy's cogent dissenting opinion. I write separately to emphasize that the majority's indication that this Court, in *Commonwealth v. Brion*, 539 Pa. 256, 652 A.2d 287 (1994), "ignored the *Edmunds* paradigm" is confusing. Majority Opinion, op. at 131 n. 10, 934 A.2d at 1206 n. 10. *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), held that Pennsylvania's Constitution provides greater protections than the United States Constitution, finding that the good faith exception to the exclusionary rule, found constitutional under the Fourth Amendment in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), violated Article I, Section 8 of Pennsylvania's Constitution. *Edmunds* requires that in order to facilitate the appropriate analysis, "litigants seeking this Court's review of claims based exclusively on the Pennsylvania Constitution" should brief and analyze the four factors generally known as the *Edmunds* analysis.[1] *Commonwealth v. Shaw*, 564 Pa. 617, 622, 770 A.2d 295, 298 (2001); *Commonwealth v. Duncan*, 572 Pa. 438, 445, 817 A.2d 455, 459 (2003) (use of *Edmunds* framework by litigants "strongly encourage[d]"). This places a burden on the litigants, not the courts. Clearly, a court may consider all of the information provided by the litigant, but it is not

1. *Edmunds* requires that
   the following four factors are to be briefed and analyzed by litigants in each case hereafter implicating a provision of the Pennsylvania constitution: 1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; [and] 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.
   *Edmunds* at 389–90, 586 A.2d at 894–95.

required to explicitly state its review of each of the four *Edmunds* factors.

If, by "ignored the *Edmunds* paradigm," the Majority means to say that there was no explicit analysis of each of the *Edmunds* factors, that is correct; however, if the Majority means that the Court failed to conduct an appropriate analysis of the history and state-specific reasons for a decision departing from federal standards, as they believe is required by *Edmunds*, that assumption is incorrect. *Edmunds* does not require that the Court's thought processes be made explicit, but rather strongly encourages that the litigants provide the Court with the appropriate information to reach a reasoned decision on an independent claim under the Pennsylvania Constitution. *See Duncan, supra.*

Justice BAER joins this dissenting opinion.