J-A11038-25

2025 PA Super 159

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SCOTT R. WILLIAMS | : | |
| | : | |
| Appellant | : | No. 544 MDA 2024 |

Appeal from the Judgment of Sentence Entered March 25, 2024
In the Court of Common Pleas of Centre County Criminal Division at
No(s):  CP-14-CR-0001169-2021

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                **FILED: JULY 24, 2025**

Appellant Scott R. Williams appeals the judgment of sentence entered by the Court of Common Pleas of Centre County after the trial court convicted Appellant of Rape by Forcible Compulsion and Aggravated Assault.  After careful review, we affirm.

In his bench trial held in 2024, Appellant was found to be responsible for the May 13, 1995 violent rape and beating committed upon T.L., a student at Penn State University in State College, Pennsylvania.  The trial court set forth the following findings of fact:

1. On May 13, 1995, T.L. was found severely beaten and in a state of undress after being raped by an unknown assailant.

2. At the scene where T.L. was found, there was blood pooling on the nearby sidewalk, a trail of blood leading toward a nearby flowerbed, significant amount of blood spatter in the nearby

---

[*] Former Justice specially assigned to the Superior Court.

flower bed and the surrounding areas, along with a pair of jeans, underwear, and shoes.

3. After T.L. was rushed to a nearby hospital and subsequently "life-flighted" to Geisinger Medical Center due to the severity of her injuries, Officer Chris Weaver requested that a sexual assault examination be conducted.

4. T.L.'s injuries and trauma were so severe that she suffered minor brain damage and, consequently, was not able to clearly recall what her assailant had looked like.

5. Detectives Thomas Jordan, John Wilson, and Ralph Ralston, with the help of other State College Police Officers, processed the crime-scene and collected numerous pieces of evidence. Of particular importance, these officers collected photographs of the scene, blood samples from every area and surface where blood could be found, the aforementioned clothing found in the flower bed, and a cigarette butt found in the aforementioned pool of blood.

6. After thoroughly processing the scene for additional hair, fibers, and bodily fluids, the officers then canvassed the area for witnesses.

7. Detectives Jordan and Wilson, after logging the evidence collected, began reviewing the photographs and information regarding persons who had previously been arrested for committing assaults and sexual assaults.

8. The above-named detectives continuously interviewed potential suspects, as well as acquaintances of T.L., all the while monitoring T.L.'s bank card and credit card, believed to have been stolen by her assailant, over the course of several months after the incident.

9. The detectives also had T.L. meet with a psychologist in the hopes that said psychologist would be able to refresh her memory.

10. This meeting proved to be somewhat effective, as T.L. was subsequently able to provide a general description of her assailant.

11. This description was used by an [Federal Bureau of Investigation (FBI)] artist to produce a sketch rendering, and Detectives Jordan and Wilson issued advisories for patrol

officers regarding a man who had committed a similar assault one week prior, and who[se] appearance matched T.L.'s description and the FBI artist's rendering.

12.    Patrol Officers further interviewed potential suspects and prepared "Field Observation Reports," which were submitted to Detectives Jordan and Wilson.

13.    The Patrol officers also took calls from citizens who believed they may have relevant information.

14.    From May 13, 1995, through May 20, 1996, Detectives Jordan, Wilson, and Ralston, along with other officers with the State College Police Department, collectively authored at least 36 reports pertaining to the assault and rape of T.L.  *See, e.g., Comm. Exs. 1, 2, 3, 66.*

15.    Detective Jordan submitted numerous pieces of physical evidence to the FBI for the purposes of creating a DNA profile and testing for potential DNA matches.  Such submissions included the clothes T.L. was wearing when she was admitted to the hospital, the clothing found in the flower bed, all the collected blood samples from the crime-scene, the hair and fiber evidence, soil samples from the flower bed, photographs of a footprint found in the flower bed, and the "SUJI sex crimes kit" containing T.L.'s blood samples, body and vaginal swabs, fingernail scrapings, hair, pulled hair, and hair clippings.  *See N.T. September 27, 2022 at 36-38*.

16.    The FBI analysis revealed seminal fluid in the vaginal swabs taken from T.L., and consequently performed a D.N.A. analysis.

17.    As a result of this D.N.A. analysis, the FBI generated D.N.A. profiles for "genetic loci D2S44, D17S79, D1S7, D4S139, D10S28, and D5S110." *See Comm. Ex. 3.*

18.    The FBI created this initial DNA profile using a Restriction Fragment Length Polymorphism test (hereafter RFLP).[FN1]

   [FN1:] RFLP is performed by extracting DNA from a sample and then cutting it into pieces.  These pieces are then placed in a gel that separates said DNA pieces by size, after which said DNA pieces are transferred onto a membrane.  After the transfer, the DNA pieces are

probed at regions of interest in a process that creates an RFLP DNA profile.

19. Generally, the "tremendous variability" of a six-loci DNA profile is "extremely useful ... for distinguishing between individuals," as the frequency with which an identical profile would occur between individuals would be between 1 in every 110 million individuals and 1 in every 15.6 sextillion individuals. *See N.T. January 12, 2023 (A.M.) at 26, 77-78.*

20. However, with regards to the particular RFLP profile generated in this case, the odds of another human possessing the same profile would be 1 in 25.1 billion. *See Id. at 27.*

21. Similarly, the odds of an identical match in a specific population group, such as Caucasians or Europeans, are as low as 1 in 1.7 trillion.

22. The RFLP profile created by the FBI, along with its lab report, was provided to Detective Jordan on or around January 2, 1996. *See Comm. Ex. 3.*

23. However, this initial FBI report did not include this statistical incidence of the subject RFLP DNA profile, as the FBI Lab's internal policy is to only include statistical analysis where a separate and matching DNA sample from a suspect is provided for the purposes of comparison and analysis. *See N.T. January 12, 2023 (A.M.) at 118 -19; N.T. January 12, 2023 (P.M.) at 19.*

24. Shortly thereafter, Detective Ralston took over as the primary investigator due to Detective Jordan's medical leave and Detective Wilson's promotion to patrol supervisor. *See N.T. December 19, 2022 at 22.*

25. Detective Ralston conducted interviews with and collected DNA samples from a number of potential suspects during this time, and requested a comparison of the DNA collected from T.L. with the DNA collected from Pennsylvania State Police in their investigation of the rape of a different woman, K.H. *Id.* at 22-24, 39-40, 49-50.

26. However, none of the DNA collected or compared was a match for T.L.'s assailant. *Id*.

27. State College police investigated and interviewed numerous persons of interest between January 2, 1996 and September

8, 1999, but were unable to find a person with DNA matching the FBI generated RFLP DNA profile even after collecting several DNA samples from said persons of interest.

28.  On September 8, 1999, Detective Jordan wrote a letter to the FBI DNA analysis unit asking for this case, if not already entered into the newly-created Combined DNA Index System (hereafter "CODIS"), to be entered into CODIS "so that the DNA can be compared to the suspect database."  *See Comm. Ex. 4*.

29.  The FBI Lab confirmed that the subject RFLP DNA profile had been uploaded to CODIS automatically, as it had already been placed in the FBI Local DNA Index System (hereafter "LDIS") on September 24, 1999.  *See Comm. Ex. 65*.

30.  The subject RFLP DNA profile was first searched against entries in the National DNA Index System (hereafter "NDIS") on February 24, 2000, and was searched weekly thereafter.  *Id*.

31.  After learning of a Milwaukee detective's successful use of a John Doe DNA profile complaint for a violent rape case in Wisconsin to avoid the expiration of the applicable statute of limitations, Detective Jordan spoke with said detective and Milwaukee District Attorney Norman Galin, Esquire, about the legal theories supporting John Doe complaints.  *See N.T. September 27, 2023* at 48-51.

32.  Using a template he received from the Milwaukee detective, Detective Jordan prepared a criminal complaint (hereafter the "Complaint") against T.L.'s assailant based on the DNA profile and other information provided by the FBI lab, which was approved by the then-serving Centre County District Attorney, Ray Gricar, Esquire*.  See N.T. September 27, 2022* at 49-53.

33.  Detective Jordan next sent the Complaint to the FBI Lab to ensure he had correctly described the RFLP DNA profile.  *Id*. at 50-52.

34.  Melissa Smrz, the FBI DNA analyst who had conducted the RFLP testing, confirmed that Detective Jordan had correctly described the DNA profile.  *Id*.

35.  Shortly thereafter, on March 29, 2000, Detective Jordan filed the Complaint against "John Doe, Unknown Male with

*Matching* Deoxyribonucleic Acid (DNA) Profile developed at Genetic Locations D2S44, D17S79, D1S7, D4S139, D10S28, and D5S110...," charging the same with Rape, Aggravated Assault, Robbery, Indecent Assault, Simple Assault, Recklessly Endangering Another Person, Theft by Unlawful Taking, and Receiving Stolen Property. *See Comm. Ex. 67* (emphasis added).

36.    In the Affidavit of Probable cause attached to and filed contemporaneously with the Complaint, Detective Jordan then specifically elaborated on how the DNA was collected, how the RFLP DNA profile was generated for these loci, where the DNA profile was being stored, and that the "John Doe" described could be expected to have a "DNA profile that matches the foreign DNA profile from the semen taken from the vaginal and genital swabs taken from [T.L.] on 5/13/1995." *Id*.

37.    While the Complaint and the Affidavit of Probable Cause do incorporate and reference the DNA profile contained within the FBI Lab Report and maintained on the CODIS database, an image or copy of this DNA profile were not attached to the Complaint or the Affidavit.

38.    Similarly, because Detective Jordan was not provided with a statistical incidence evaluation for the RFLP DNA profile by the FBI Lab, such statistical incidence could not be and was not listed in the Complaint or the Affidavit of Probable Cause. [FN2]

> [FN2:]    The Court notes that the Commonwealth's experts testified that, while RFLP tests can result in incredibly specific DNA profiles with a very low frequency of common occurrence, one of the shortcomings of RFLP testing is that RFLP test results cannot be reported in as concise, discrete, and well defined of a manner as later iterations of DNA testing. *See N.T. January 12, 2023 (A.M)* at 97, 106; *N.T. January 12, 2023 (P.M.)* at 15, 44-48.

39.    In 2002, Detective Jordan retired from the State College Police Department, and Detective Ralston fully took over T.L.'s case.

40.    In 2002, Detective Ralston learned that the FBI lab had switched from RFLP DNA testing to short tandem repeat (hereafter "STR") testing,[FN3] and that CODIS "was

transitioning from RFLP to STR." *See N.T. December 19, 2022* at 30.

> [FN3:] The transition from RFLP testing to STR testing was due to the high efficiency of STR testing. While RFLP testing can result in a more specific and less frequently occurring DNA profile than an STR test done with the same amount of DNA loci, the RFLP testing process requires a larger sample of DNA, and takes several days to complete. In contrast, an STR test can be done much more quickly, on a much smaller DNA sample, and can be performed overnight. While an STR test would need to be conducted across 13 DNA loci to reach the same level of genetic specificity as a 6 DNA loci RFLP test, STR profiles are more easily and accurately compared with one another, while RFLP comparisons require a more intensive comparison and analysis process that is ultimately less precise than the comparison between STR profiles. See N.T. January 12, 2023 (A.M.) at 78-79, 97, 106-09; N.T. January 12, 2023 (P.M.) at 5-7.

41. In 2002, Detective Ralston also became aware of the possibility that the semen sample collected from T.L.'s vaginal swab could have been from T.L.'s former paramour, with whom T.L. may have had consensual intercourse with at some point prior to her assault.

42. Accordingly, Detective Ralston collected a DNA sample from T.L.'s former paramour and submitted the same to the FBI Laboratory, along with a request that the FBI Lab generate an STR profile from the seminal fluid collected from T.L. on May 13, 1995, and compare the same with the DNA collected from T.L.'s former paramour.

43. On or around January 21, 2004, the FBI Laboratory provided Detective Ralston with a Lab Report indicating that the DNA collected from T.L. was not a match for the DNA submitted by her former paramour, and containing an STR DNA profile from the seminal fluid collected from T.L.'s vaginal swab. *See Commonwealth Ex. 8.*

44. On February 11, 2004, that STR DNA profile was uploaded onto CODIS, and was searched weekly until the summer of 2014, biweekly from the summer of 2014 until 2017, and daily from 2017 onward. *See N.T. January 12, 2023 (p.m.)* at 73-75.

45.    Despite the efforts of State College Police and frequent CODIS searches as detailed above, no viable leads were generated until approximately 2019.

46.    In early 2019, Detective Steven Bosak (hereafter "Detective Bosak") [of the State College Police] asked that T.L.'s case be assigned to him so that he could attempt the then-novel process of utilizing genetic genealogy.  *See N.T. December 19, 2022* at 109-10.[FN4]

> [FN4:] Detective Bosak had previously utilized genetic genealogy processes to apprehend a serial rapist, after learning about the technique following its use to locate and apprehend the "Golden State Killer" in 2018.

47.    After confirming with the FBI Lab that there were sufficient samples of the previously collected DNA to conduct further DNA analyses, Detective Bosak contacted Parabon, a private company that conducts genetic genealogy investigations, to confirm that such an investigation into the identity of T.L.'s assailant would be possible.  *Id*. at 110-15.

48.    Having so confirmed that a genetic genealogy investigation would be possible, Detective Bosak sent seminal fluid samples "Q1/Q2" to DNA Solutions [FN5] for analysis.  *Id*. at 116-18.

> [FN5:] DNA Solutions is a private lab that works in conjunction with Parabon.

49.    After DNA Solutions conducted its tests, Parabon uploaded said test results into two databases that maintain DNA profiles for genealogical purposes, GEDMatch and Family Tree DNA.  *Id*. at 118.

50.    On November 23, 2020, Parabon sent Detective Bosak a preliminary report that listed potential characteristics of T.L.'s assailant based on his genetic information. However, Detective Bosak did not find this preliminary report to be particularly useful.  *Id*. at 120.

51.    In December of 2020, Parabon sent Detective Bosak the first official genetic genealogy report generated from the DNA left behind by T.L.'s assailant.  This report confirmed the existence of persons, though not by name, with whom T.L.'s assailant shared DNA "centimorgans."

52.    Detective Bosak next requested the names of the persons with whom T.L.'s assailant shared these centimorgans, then began working with a genealogist at Parabon to interview such persons in order to construct a family tree for T.L.'s assailant. *Id*. at 126-30.

53.    Some of the persons interviewed gave DNA samples to assist in the investigation, and consented to Parabon using their existing genealogical profiles to further assist this process. *Id*. at 132-36.

54.    These interviews and investigations eventually led to a woman named Wanda Williams, who also provided a DNA sample. *Id*. at 137-40.

55.    Testing of Ms. Williams' DNA revealed that she was the mother of T.L.'s assailant. *Id*.

56.    Conversation with Ms. Williams revealed that she had three children, two of whom were male: Marc Williams, and [Appellant], Scott Williams. *Id*. at 139-40.

57.    Detective Bosak also attempted to contact Richard Edward Williams, Wanda Williams' former husband and the father of Marc and Scott Williams, in-person and by phone, but Richard Edward Williams was uncooperative. *Id*. at 140.

58.    Subsequent investigation revealed that Marc Williams had lived in Alaska since leaving college in his senior year, and that [Appellant] lived in Reedsville, Pennsylvania. *Id*. at 140-42.

59.    Further investigation into [Appellant's] family led Detective Bosak's partner, Detective Nicole Eckley (hereafter "Detective Eckley") to monitor [Appellant's] wife's social media posts. From this monitoring, Detective Bosak learned that [Appellant's] son would soon be attending a banquet for his high school football team in February of 2021. *Id*. at 146.

60.    Detective Bosak and Detective Eckley then got permission to attend the aforementioned banquet undercover by posing as custodial staff, in an attempt collect [Appellant's] DNA from discarded food items, utensils, plateware, etc. *Id*.

61.    However, [Appellant] did not eat or drink at the banquet, so the detectives were unable to collect [Appellant's] DNA at this time. Nevertheless, they were able to retrieve the DNA of

- 9 -

[Appellant's] son, Z.W., from trash Z.W. had discarded into the trash can. *Id*. at 146-47.

62. Testing of Z.W.'s DNA then revealed that Z.W. was the biological son of T.L.'s assailant. *Id*. at 151.

63. Finally, the detectives confirmed that Defendant was a match for the DNA collected by collecting a DNA sample from [Appellant's] spit bottles. Said bottles were left in the trash that [Appellant] had taken to the street, and were initially picked up by a local waste management company before being seized by Detectives Bosak and Ripka. *Id*. at 152-54.

64. No warrants were issued for the seizure of Z.W.'s DNA or for the seizure of [Appellant's] trash.

65. After testing [Appellant's] DNA, the detectives were able to confirm that [Appellant] was the same person whose DNA was collected from T.L. after her assault.

66. On October 4, 2021, a warrant was issued for the arrest of [Appellant], and [Appellant] was subsequently arrested on October 5, 2021.

Trial Court Opinion (T.C.O.), 10/6/23, at 2-12.

On November 29, 2021, the Commonwealth filed a criminal information charging Appellant with Rape by Forcible Compulsion, Aggravated Assault, Robbery with Fear of Serious Bodily Injury, Indecent Assault, Simple Assault, Recklessly Endangering Another Person, Theft by Unlawful Taking, and Receiving Stolen Property.

On June 30, 2022, Appellant filed an omnibus pretrial motion raising numerous motions to quash the counts set forth in the criminal information as well as a motion seeking to suppress evidence. First, Appellant claimed that all counts against him should be quashed as the initial warrant identifying the perpetrator as John Doe and setting forth a genetic profile (hereinafter "John

Doe DNA warrant") failed to satisfy the specificity and particularity requirements set forth in both the federal and Pennsylvania Constitutions. Second, Appellant claimed that he was entitled to dismissal of the entire action based on the Commonwealth's violation of Pa.R.Crim.P. 600. Third, Appellant argued his constitutional right to a speedy trial was violated. Fourth, Appellant asserted that his due process rights were violated. Fifth, Appellant requested the dismissal of several of the charges based on the applicable statutes of limitations. Sixth, Appellant asked the trial court to suppress evidence obtained from warrantless seizures of trash discarded by both Appellant and Z.W. The Commonwealth provided written responses to each of Appellant's individual pretrial motions.

The trial court held multiple evidentiary hearings on Appellant's omnibus pretrial motion on September 27, 2022, December 19, 2022, January 12, 2023, and May 30, 2023. The trial court heard testimony from the State College criminal investigators involved in this case: Detective Jordan, Detective Wilson, Detective Ralston, and Detective Bosak. The trial court also evaluated the testimony of Dr. Michael Holland, professor of molecular biology at Penn State University, Alan Giusti, a DNA caseworker and analyst employed by the FBI, and Dr. Thomas Callaghan, chief biometric scientist for the FBI laboratory division.

On October 6, 2023, the trial court entered a memorandum and order denying the majority of Appellant's claims for relief in its omnibus pretrial motion. The trial court partially granted Appellant's pretrial motion in that it

dismissed the counts of Indecent Assault, Simple Assault, and REAP, as the Commonwealth had agreed to their dismissal on the basis that the applicable statutes of limitations had expired.

After waiving his right to a jury trial, on February 8, 2024, Appellant proceed to a stipulated bench trial held at which the trial court convicted Appellant of Rape – Forcible Compulsion and Aggravated Assault. The remaining charges were *nol prossed*.

On March 25, 2024, the trial court sentenced Appellant to four and one half (4½) to nine (9) years' imprisonment on the rape conviction and a consecutive term of five and one half (5½) to eleven (11) years' imprisonment on the aggravated assault conviction. As such, Appellant received an aggregate sentence of ten (10) to twenty (20) years' imprisonment.

On April 4, 2024, Appellant filed this timely appeal. On May 2, 2024, Appellant complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review on appeal:

A. Did the Doe DNA Complaint and Warrant fail to meet the specificity and particularity requirements of Article I, § 8 of the Pennsylvania Constitution, the Fourth and Fourteenth Amendments of the federal constitution, and Pa.R.Crim.P. 504, thus failing to toll the statute of limitations and barring the instant prosecution?

B. Did the prosecution fail to exercise due diligence to bring [Appellant] to trial within the period required by Pa.R.Crim.P. 600?

C. Were [Appellant's] rights to a speedy trial, under the Sixth and Fourteenth Amendments of the federal constitution and Article

I, § 9 of the Pennsylvania Constitution, violated where the prosecution commenced the prosecution over 21 years after the filing of the Doe DNA Complaint and Warrant?

D. Did the warrantless search and seizure of trash outside [Appellant's] home through which items containing DNA were seized and DNA extracted violate Article I, § 8 of the Pennsylvania Constitution, requiring that all evidence derived by, and tainted as a result of, the warrantless search and seizure be suppressed?

E. Did the warrantless search, seizure, and extraction of DNA from the items seized from the trash search and Z.W.'s utensils, and the creation of DNA profiles therefrom, violate [Appellant's] rights to be free from unreasonable searches and seizures, and his right to privacy, protected by the Fourth and Fourteenth Amendments of the federal constitution and Article I, § 8 of the Pennsylvania Constitution, requiring that all evidence derived by, and tainted as a result of, the warrantless seizures, searches; extractions and creation of DNA profiles be suppressed?

Appellant's Brief, at 5-6.

### *Challenge to Specificity and Particularity of Initial Complaint*

Appellant first claims that the initial John Doe DNA complaint and warrant filed on March 29, 2000 were invalid as they failed to describe Appellant with the specificity and particularity required by both the Fourth Amendment of the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution. Appellant argues that the challenged complaint and warrant, which reference the six genetic locations (loci) at which the perpetrator's DNA profile was developed, failed to identify a specific individual as the accused as the Commonwealth failed to attach the full DNA profile or discuss the statistical probability that the DNA profile could be associated with someone other than the perpetrator. As a result, Appellant argues that the

invalid complaint/warrant did not toll the applicable statute of limitations for the charges for which he was convicted.

A criminal prosecution must be commenced within the applicable statute of limitations. 18 Pa.C.S.A. § 108. Our Supreme Court has recognized that "only the filing of a valid complaint or the issuance of a valid warrant is sufficient to toll the statute of limitations." **Commonwealth v. Laventure**, 586 Pa. 348, 362, 894 A.2d 109, 117 (2006) (citation omitted). As it is undisputed that the Commonwealth filed the initial complaint in this matter accusing Appellant rape and aggravated assault within the applicable statutes of limitations, we proceed to review whether the initial complaint and arrest warrant were valid.[1]

The Fourth Amendment of the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). Article I, Section 8 of the Pennsylvania Constitution provides that "no warrant

---

[1] The Commonwealth filed the initial complaint on March 29, 2000 within five years of the May 13, 1995 attack. Thus, the five-year statute of limitations periods for rape and aggravated assault effective at that time had not yet expired. 1995, March 31, P.L. 959, No. 10 (Spec. Sess. No. 1), § 16, effective in 60 days; 1996, March 29, P.L. 51, No. 17, § 1, effective in 60 days; 1998, Dec. 21, P.L. 1086, No. 145, § 2, effective in 60 days; 42 Pa.C.S.A. § 5552.

Although we recognize that the Pennsylvania Legislature subsequently created an exception to the statute of limitations for cases where DNA evidence was collected from unknown perpetrators, such exception is inapplicable here as it was enacted subsequent to the expiration of the statute of limitations in this case. **See** 42 Pa.C.S.A. § 5552(c.1).

to search any place or to seize any person or things shall issue without describing them *as nearly as may be*." Pa. Const. art. I, § 8. **See also** Pa.R.Crim.P. 504(2) (requiring every complaint to contain "a description of the defendant *as nearly may be*") (emphasis added).

Our Supreme Court has determined that while these two constitutional provisions are similar, "the text of the Pennsylvania Constitution, 'as nearly as may be,' requires more specificity than the federal particularity requirement." **Laventure**, 586 Pa. at 363, 894 A.2d at 118 (citation omitted). As such, "the 'as nearly as may be' language of the Pennsylvania Constitution (and correspondingly that of Rule 504(2)) subsumes the requirement of the Fourth Amendment that a warrant must 'particularly describe' the person to be seized." **Id.**

The clear meaning of the language in the Pennsylvania Constitution that requires a warrant to describe items "as nearly as may be" requires officers "describe the items as specifically as is reasonably possible." **Commonwealth v. Rivera**, 816 A.2d 282, 290 (Pa.Super. 2003) (citation omitted). However, "the mere specification of all information that is available is not in and of itself enough; rather, actual reasonable particularity is required sufficient to limit governmental discretion in the execution of the warrant and pursuit of the associated criminal process." **Laventure**, 586 Pa. at 364, 894 A.2d at 118.

Although there is scant precedent in Pennsylvania law discussing John Doe warrants, the Supreme Court in **Laventure** suggested that a John Doe

warrant would satisfy the Commonwealth's particularity requirements if it set forth reasonably specific identification characteristics of an unknown suspect that provide officers executing the warrant ample guidance and little discretion as to whom to arrest. *Id.* at 364, 894 A.2d at 119 (emphasis added). While the *Laventure* Court found that the John Doe arrest warrant in that case was not sufficiently specific when it only identified the suspect as "Steve," a white male in his thirties with an unknown address, the Supreme Court noted with approval that other jurisdictions had upheld John Doe arrest warrants that included a description of the defendant's location, a particularized physical description, a combination of physical description and location, or "*identification of the accused according to his unique genetic information*." *Id.* (emphasis added) (citing cases).

In suggesting that certain John Doe arrest warrants with DNA identification information could be valid, our Supreme Court in *Laventure* cited *State v. Dabney,* 663 N.W.2d 366, 372 (Wis.Ct.App. 2003), in which the Wisconsin Court of Appeals determined that a complaint and arrest warrant identifying the unknown suspect as John Doe and setting forth a specific DNA profile were sufficient to satisfy the state's statutory requirement that warrants contain sufficient description to identify the person to be arrested with "reasonable certainty."[2]

_____

[2] While we acknowledge that the portion of the Supreme Court's decision in *Laventure* discussing the validity of "John Doe" DNA warrants is dicta as the
*(Footnote Continued Next Page)*

The ***Dabney*** court concluded that "for purposes of identifying 'a particular person' as the defendant, a DNA profile is arguably the most discrete, exclusive means of personal identification possible. 'A genetic code describes a person with far greater precision than a physical description or a name.'" ***Id.*** (quoting Meredith A. Bieber, Comment, *Meeting the Statute or Beating It: Using "John Doe" Indictments Based on DNA to Meet the Statute of Limitations,* 150 U.Pa.L.Rev. 1079, 1085 (2002)).

After ***Dabney*** was filed, several courts of our sister states and federal courts adopted the conclusion reached therein; the Minnesota Court of Appeals observed that "[a] growing consensus has developed around the central holding of ***Dabney*** that a DNA profile meets both the particularity requirements of the Fourth Amendment and the states' 'reasonably certain' statutory requirements because of its ability to describe a person with much greater accuracy than a person's name or physical description." ***State v. Carlson***, 845 N.W.2d 827, 831 (Minn.Ct.App. 2014) (collecting cases). ***See also State v. Younge***, 321 P.3d 1127, 1132 (Ut. 2013) (finding "a DNA profile is as close to an infallible measure of identity as science can presently obtain"); ***Commonwealth v. Dixon***, 938 N.E.2d 878, 885 (Mass. 2010) ("[a]

---

facts of ***Laventure*** involved a general warrant with a vague description of the suspect, the ***Laventure*** Court's citation to the ***Dabney*** decision of the Wisconsin Court of Appeals serves to focus our analysis in this case. Further, although "decisions of federal courts, as well as those from 'sister states,' are not binding on this Court, [they] may be used as persuasive authority." ***Commonwealth v. Lang***, 275 A.3d 1072, 1083 (Pa.Super. 2022) (quoting ***Commonwealth v. Arthur***, 62 A.3d 424, 429 n. 9 (Pa.Super. 2013)).

DNA profile is not merely a word of "description," it is metaphorically an indelible 'bar code' that labels an individual's identity with nearly irrefutable precision") (citation omitted).

Consistent with these decisions, we also find that an arrest warrant setting forth a DNA profile satisfies both the particularity requirement of the Fourth Amendment as well as Pennsylvania's constitutional requirement that arrest warrants describe the person to be seized "as nearly as may be." A John Doe DNA warrant identifies the perpetrator using a genetic profile with incredible precision and describes the perpetrator with sufficient particularity to prevent arbitrary or capricious arrests. The discretion of the officers executing the warrant is directly limited by scientific methodology employed by forensic laboratories which determines whether a suspect's DNA matches the perpetrator's DNA obtained from the crime scene.[3]

We recognize that Appellant also argues that John Doe DNA complaint and warrant in this case were not sufficiently specific to identify Appellant as neither attached the full DNA profile of the alleged perpetrator, but merely referenced the six genetic loci at which the DNA profile was developed. Appellant asserts that the Commonwealth was required to attach the actual

---

[3] The Legislature has also recognized the value that DNA forensic analysis provides to criminal prosecutions as demonstrated by its expansion of the statute of limitations for felony offenses and certain misdemeanor sexual offenses in which DNA evidence is obtained but unable to be matched to a particular individual until a later date. *See* 42 Pa.C.S.A. § 5552(c.1). We reiterate that the extended statute of limitations period does not apply in this case as it was not effective until after the applicable statute of limitations had already expired.

DNA profile to the complaint and warrant and to set forth the range of statistical probability that the DNA profile that was developed could be associated with someone other than the actual perpetrator. Appellant asserts that the Doe DNA complaint and warrant in this case were meaningless as officers could not use these documents to identify the perpetrator without additional inquiry from the FBI. Appellant's Brief, at 34-35.

We reject Appellant's suggestion that the Doe DNA complaint and warrant in this case did not identify any specific individual. As noted above, the Complaint in this case sought the apprehension of "John Doe, Male with *Matching* Deoxyribonucleic Acid (DNA) Profile developed at Genetic Locations DS244, D17S79, D1S7, D4S139, D10S28, and D5S110." Complaint, 3/29/00, at 1 (emphasis added). The affidavit of probable cause attached to and filed contemporaneously with the complaint thoroughly discussed how the DNA was collected, how the RFLP DNA profile was generated for the six loci, and where the DNA profile was stored with the FBI on the CODIS database. The affidavit of probable cause reiterated that the perpetrator to be seized could be expected to have a "DNA profile that *matches* the foreign DNA profile from the semen taken from the vaginal and genital swabs taken from [T.L.] on 5/13/1995." Affidavit of Probable Cause, 3/29/00, at 2 (emphasis added).

As such, the language contained in the Doe DNA complaint/warrant filed in this case accurately identified the perpetrator as an individual with a DNA profile that matched the referenced DNA profile at six specified genetic loci, which was developed from seminal fluid collected from T.L.'s vaginal and

genital swabs after the attack. Although the Commonwealth did not include any discussion of statistical probability within the John Doe DNA complaint or warrant, the Commonwealth's expert, Dr. Holland, testified that the probability that the six-loci DNA profile referred to in the John Doe DNA complaint/warrant created by the FBI using RFLP technology would randomly occur in the population fell between 1 and 25.1 billion at a conservative estimate, and between 1 and 1.7 trillion in a specific population group like Europeans or Caucasians. *See* Notes of Testimony (N.T.), 1/12/23 (a.m.), at 26-27.

Our conclusion is supported by the decision in ***Washington v. Boughton***, 884 F.3d 692 (7th Cir. 2018), in which the Seventh Circuit Court of Appeals rejected identical arguments made by the defendant who argued that the complaint and arrest warrant were not sufficiently specific to identify the perpetrator because they did not attach a full DNA profile, but merely had "included the locations of six DNA markers that are common to all human beings." ***Id.*** at 699. The Seventh Circuit held as follows:

> Washington's suggestion that the complaint and warrant do no more than describe the defendant as having unspecified genetic material at each of six universally common genetic locations overlooks the narrative portion of the complaint entirely. It also ignores the meaning of the word "matching" in both the complaint and the warrant. When the instruments are read together and in their entirety, the word "matching" means that the specific genetic markers at the identified locations on John Doe #5's genetic code are the same as the genetic markers found at those same locations on the genetic code of the assailant, as determined based on an analysis of his semen.

*Id.* at 700.

Further, while the Seventh Circuit acknowledged in **Boughton** that the complaint and warrant, which did not include a full DNA profile, "did not describe the genetic markers using numbers to represent the discrete 'allele systems' observed at the identified genetic locations," it pointed out DNA experts had explained that "the DNA technology in use at the time the John Doe complaint and warrant were issued 'just was not advanced enough' to do so." *Id.* Nevertheless, the Seventh Circuit concluded that the complaint and warrant identified the defendant "with particularity and specificity" by describing John Doe's DNA profile as "matching" DNA profiles they developed using the technology available at that time. *Id.*

Similarly, in this case, we are not persuaded by Appellant's suggestion that the complaint and warrant were invalidated because the full DNA profile developed by the FBI was not attached to either document. We emphasize that warrants "should not be invalidated by hypertechnical interpretations." **Commonwealth v. Rega**, 593 Pa. 659, 684, 933 A.2d 997, 1012 (2007).

Although the Complaint and Affidavit of Probable Cause incorporated and referenced the DNA profile maintained by the FBI on the CODIS database, investigators indicated that they did not provide a full DNA profile with the John Doe DNA complaint and warrant as the FBI Lab had never reported the technical details of the RFLP DNA testing results to the police. At the pretrial motion hearing, Alan Giusti, a DNA analyst for the FBI, testified that when the FBI reported the 1996 RFLP testing results to the State College investigators,

they did not provide the full RFLP profile or any of the information contained at each loci, as one of the limitations with RFLP testing was that "there was no way to characterize the RFLP results in a discrete, well-defined manner as [can be done with later developed] STR testing." N.T., 1/12/23 (a.m.), at 110-12, N.T., 1/12/23 (p.m.), at 14-15. Giusti also testified that the FBI Lab did not provide any statistical frequency or probability analysis in the RFLP report given to State College investigators as the FBI had an internal policy to only include such statistical analysis to compare the created DNA profile with a separate DNA sample from a potential suspect. N.T., 1/12/23 (a.m.), at 118-119; N.T., 1/12/23 (p.m.), at 16-19.

Even assuming *arguendo* that the full RFLP profile could have been attached to the John Doe complaint/warrant, Appellant fails to demonstrate how access to the full DNA profile would have been useful to investigators in executing the warrant. Giusti testified the FBI did not send any graphical depictions of the RFLP profile to the State College investigators, explaining that "there would be no benefit to sending data to non-DNA scientists to review it. It wouldn't mean anything to them." N.T., 1/12/23 (a.m.), at 111.

Even if the Commonwealth had attached the DNA profile to the complaint and warrant, extrinsic evidence would have been needed to allow the officers to execute the arrest warrant of a suspected perpetrator. Investigators could not arrest any individual pursuant to the John Doe DNA warrant unless they submitted a DNA sample from the suspect to the FBI laboratory to confirm whether it matched the DNA profile of the perpetrator.

Given that the John Doe DNA complaint and warrant in this case specifically required the person to be seized to have genetic markers that matched the incredibly specific DNA profile mentioned above, the description contained in the John Doe DNA complaint and warrant narrowly limited the possibility of identifying the wrong person and eliminated any discretion on the part of officers seeking to execute the warrant. We agree with the trial court's observation that the identification of the perpetrator through this DNA profile had a "level of specificity that goes well beyond that of a mere name and physical description, that it would be nearly impossible that any individual other than the person who contributed the semen sample to T.L. would be seized." T.C.O. at 33.

Accordingly, we conclude that the trial court did not err in finding that the John Doe DNA complaint and warrant filed in this case satisfied the relevant federal and Pennsylvania specificity and particularity requirements and tolled the applicable statutes of limitations to allow for Appellant's prosecution.

### Alleged Violation of Pa.R.Crim.P. 600

Appellant next argues that the trial court erred in failing to dismiss this action for violating Pa.R.Crim.P. 600. We generally review the trial court's disposition of a Rule 600 motion for an abuse of discretion. *Commonwealth v. Harth*, 666 Pa. 300, 323, 252 A.3d 600, 614 n.13 (2021).

> In evaluating Rule [600] issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon

facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule [600]. Rule [600] serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule [600] was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

***So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule [600] must be construed in a manner consistent with society's right to punish and deter crime*.** In considering [these] matters ... courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

***Commonwealth v. Horne***, 89 A.3d 277, 283–84 (Pa.Super. 2014) (emphasis added & citation omitted).

Rule 600 requires that, in a case in which a written complaint is filed, trial must commence within 365 days of the date the complaint is filed. Pa.R.Crim.P. 600(A)(2)(a). If a defendant is not brought to trial within the required time, he "may file a written motion requesting that the charges be

dismissed with prejudice on the ground that this rule has been violated." Pa.R.Crim.P. 600(D)(1). The trial court must then conduct a hearing on the motion. *Id*. Subsection (C) further provides that when computing time for Rule 600 purposes, "periods of delay at any stage of the proceeding caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of time within which trial must commence[, but a]ny other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1). Therefore, a Rule 600 analysis entails the following three steps:

> First, Rule 600(A) provides the mechanical run date. Second, we determine whether any excludable time exists pursuant to Rule 600(C). We add the amount of excludable time, if any, to the mechanical run date to arrive at an adjusted run date.
>
> If the trial takes place after the adjusted run date, we apply the due diligence analysis set forth in Rule 600([D]). As we have explained, Rule 600[] encompasses a wide variety of circumstances under which a period of delay was outside the control of the Commonwealth and not the result of the Commonwealth's lack of diligence. Any such period of delay results in an extension of the run date.
>
> Addition of any Rule 600[ ] extensions to the adjusted run date produces the final Rule 600 run date. If the Commonwealth does not bring the defendant to trial on or before the final run date, the trial court must dismiss the charges.

*Commonwealth v. Faison*, 297 A.3d 810, 821–22 (Pa.Super. 2023), *appeal denied*, 320 A.3d 82 (Pa. 2024) (citation omitted).

Determining whether the Commonwealth exercised due diligence is a fact-specific inquiry, which "does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable

effort." Pa.R.Crim.P. 600, comment (quoting **Commonwealth v. Selenski**, 606 Pa. 51, 61, 994 A.2d 1083, 1089 (2010)). Matters of "due diligence must be judged by what was done by the authorities rather than by what was not done." **Commonwealth v. Lynch,** 57 A.3d 120, 125 (Pa.Super. 2012) (citation omitted). The Commonwealth's "efforts need only be reasonable; lack of due diligence should not be found simply because other options were available or, in hindsight, would have been more productive." **Commonwealth v. Ingram**, 591 A.2d 734, 737 (Pa.Super. 1991) (citation omitted).

Appellant argues that the Commonwealth did not act with due diligence during the entire twenty-one year period from the filing of the John Doe DNA complaint to Appellant's 2021 indictment. Appellant argues that while the prosecution was initially active in its investigation, it cannot be found to have exercised due diligence when it simply waited for a DNA match through the FBI's database. Further, Appellant points out that although the Commonwealth knew T.L. had a boyfriend in 1995, prosecutors did not seek to determine whether the semen found in T.L.'s swabbing belonged to T.L.'s boyfriend until 2002.

During the nearly five-year period from the attack to the filing of the initial John Doe DNA complaint, investigators conducted a meticulous investigation, including the collection of numerous DNA samples of the crime scene which were submitted to the FBI for testing and inclusion in a nationwide law enforcement DNA database (CODIS). By the time the initial complaint

was filed in 2000, the officers had exhausted their investigative leads and the perpetrator's DNA profile was subject to weekly, and eventually daily, searches on CODIS for multiple years. As technology progressed, Detective Bosak initiated a genealogical DNA investigation to create a family tree of the relatives of the perpetrator and ultimately identified the mother of the perpetrator. Investigators subsequently obtained samples of Appellant's son's DNA and Appellant's DNA through seizures of discarded items containing genetic material, through which they confirmed Appellant was the perpetrator.

We are not convinced that the Commonwealth failed to exercise due diligence when it did not test the DNA of T.L.'s boyfriend in the early stages of the investigation, as T.L. initially told police that she did not have consensual sexual intercourse with anyone on the day she was attacked. It was not until investigators conducted a subsequent interview with T.L. in 2002 that she revealed that she may have had consensual intercourse with her boyfriend a day or two before the attack. As such, the investigators were not initially aware that there could have been an alternate source for the semen discovered in T.L.'s vaginal swab other than the perpetrator of the attack. The investigators promptly submitted a DNA sample from T.L.'s boyfriend for analysis, and it was ultimately determined that he was not a match for the DNA sample collected after the attack.

Moreover, we agree with the trial court's finding that although the twenty-one year delay between the filing of the complaint and the indictment was extraordinary, the reason for the delay was the Commonwealth's failure

to identify the perpetrator of the crime despite their due diligence. Although Appellant claims that the investigators failed to take substantive actions to move the case forward during the twenty-one year period between the filing of the initial complaint and his indictment, Appellant fails to recognize that the investigators had exhausted all viable leads through which they could seek to identify a perpetrator through conventional investigative methods. As such, the trial court did not err in determining that Appellant was not entitled to have the charges against him dismissed as the Commonwealth exercised due diligence in seeking to identify the perpetrator and the delay in the prosecution was caused by circumstances beyond the Commonwealth's control.

### *Alleged Violation of the Constitutional Right to a Speedy Trial*

Appellant also argues that the trial court erred in denying his pretrial motion to dismiss based on a violation of his constitutional right to a speedy trial. In evaluating speedy trial issues, our standard of review is "whether the trial court abused its discretion, and our scope of review is limited to the trial court's findings and the evidence on the record, viewed in the light most favorable to the prevailing party." *Commonwealth v. Womack*, 315 A.3d 1229, 1237 (Pa. 2024) (citation omitted).

Speedy trial analysis requires a two-step inquiry: "we first consider whether the delay violated Pa.R.Crim.P. 600, and if not, we may proceed to the four-part constitutional analysis set forth in *Barker* [*v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)]." *Commonwealth v. Martz*, 232 A.3d 801, 812 (Pa.Super. 2020) (citation omitted). As we have conducted a

Rule 600 inquiry and discerned no violation of Appellant's rights, we proceed to review Appellant's independent constitutional speedy trial claim.

"The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution guarantee a criminal defendant the right to a speedy trial." *Commonwealth v. DeBlase*, 542 Pa. 22, 32, 665 A.2d 427, 432 (1995) (footnote omitted). In *Barker*, the United States Supreme Court set forth a four-part balancing test to determine whether a defendant's speedy trial rights had been violated, requiring consideration of (1) the length of the delay, (2), the reason for the delay, (3) whether the defendant asserted his or her right to a speedy trial, and (4) prejudice to the defendant as a result of the delay. *Barker*, 407 U.S. at 530–32, 92 S.Ct. at 2192–93. The *Barker* Court clarified that prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," such as "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532, 92 S. Ct. at 2193.

It is important to note that a speedy trial violation does not necessarily occur when a court finds in favor of the defendant on any one of the four factors; "[r]ather, each of the four factors are related and each must be weighed carefully in the court's evaluation of a criminal defendant's claim that his speedy trial rights were violated." *DeBlase*, 542 Pa. at 32, 665 A.2d at 432 (citing *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193-94).

Appellant argues that the twenty-one year delay between filing of the initial complaint and his arrest was presumptively prejudicial. Appellant also argues that he did not cause the delay, asserted his speedy trial rights early in the prosecution, and claims he was prejudiced by the delay as the significant passage of time hampered his ability to present a defense. Appellant argues that it is nearly impossible to recall what he was doing or where he was twenty-one years ago or to find alibi witnesses to testify on his behalf.

We acknowledge that there is no relevant Pennsylvania precedent to govern our analysis of delay in prosecution associated with identifying a "John Doe" perpetrator through DNA analysis. However, other jurisdictions have rejected similar constitutional speedy trial claims. In *Guerrero v. LaManna*, 325 F.Supp.3d 476 (S.D.N.Y. 2018), the U.S. District Court for the Southern District of New York concluded that the defendant's speedy trial rights had not been violated by a thirteen-year delay in prosecution which was caused by the state's practical inability to identify the perpetrator despite the creation of a DNA profile from the evidence obtained at the crime scene. The *Guerrero* Court emphasized that the defendant had not been subjected to any incarceration or anxiety as an accused, but rather had benefited from the delay which allowed him to remain free for more than twelve years. *Id.* at 486. Further, the *Guerrero* court found that the defense was not impaired by the delay "due to the nature and conclusiveness of the DNA evidence" and the fact that "there was no indication that the trial would have proceeded any differently if it had proceeded" years earlier. *Id.*

- 30 -

In *Younge*, the Utah Supreme Court found the defendant's speedy trial rights were not violated by a nine-year delay between the filing of a John Doe information and the amendment of the complaint to identify Younge by name. The Utah Supreme Court found the delay was beyond the control of the prosecution which was unable to determine the perpetrator's identity until it was notified of a DNA match through the FBI database. *Younge*, 321 P.3d at 1136. Further, the *Younge* Court found that the defendant was not prejudiced by the delay given the compelling, uncontradicted DNA evidence and rejected any claim that a jury would have acquitted him but for the loss of potential witness testimony as a result of the passage of time. *Id.*

In applying the *Barker* balancing test in this case, we wholly agree with the trial court's assessment that the twenty-one year delay between the filing of the initial complaint and Appellant's arrest was extraordinarily long. However, while the first factor weighs in Appellant's favor, we do not feel that the length of the delay alone is sufficient to entitle Appellant to relief. We reiterate that our Legislature passed Section 5552(c.1) of the Crimes Code, which expanded the statute of limitations for felonies and certain misdemeanor sex offenses where genetic identification evidence is collected from unknown perpetrators, to allow the prosecution for the offense to commence "one year after the identity of the individual is determined." *See* 42 Pa.C.S.A. § 5552(c.1)). This statute highlights the Legislature's appreciation for the utility of DNA analysis in criminal prosecutions despite an

understanding that there may be significant delays in the prosecution of a suspect where the only identification evidence is a DNA sample.

The second factor, the reason for the delay, weighs against Appellant. The trial court again emphasized that the significant delay was caused by the prosecution's inability to identify the perpetrator despite the exercise of due diligence. Thus, the prosecution had a valid reason for the delay in Appellant's prosecution as he had not been matched to the DNA profile listed in the initial complaint. The third factor, the defendant's assertion of his rights, weighs in Appellant's favor, as the trial court found that Appellant did timely raise his speedy trial rights after this action was commenced.

With regard to the fourth factor, the trial court reasonably concluded that Appellant did not establish prejudice in this case. The trial court found Appellant did not suffer any oppressive pretrial incarceration during the twenty-one year delay between the filing of the complaint and the commencement of this action. In addition, the trial court noted that the delay did not cause Appellant to suffer any anxiety or concern during such period, but rather benefited Appellant by allowing him to remain a free man for twenty-one years as evidenced by his own argument that he "started a family, had two children, was very active in their lives, and had an excellent job." *See* Appellant's Brief in Support of Omnibus Pretrial Motion, at 52.

The trial court did acknowledge that Appellant's ability to present a defense has been impaired by the lengthy delay which risked the loss of exculpatory evidence and the deterioration of the memory of witnesses that

could testify on behalf of the defense. However, as the trial court noted that Appellant had not identified any specific evidence or witness testimony that was lost or compromised as a result of the delay, the trial court found that such evidence was "entirely speculative." T.C.O. at 36.

Moreover, we emphasize that given the accuracy and precision of the compelling DNA evidence linking Appellant to the assault of the victim, we fail to see how Appellant was prejudiced by the delay as he has not demonstrated that the trial would have proceeded differently had the prosecutors identified Appellant as the perpetrator years earlier. The conclusiveness of the DNA evidence weighs heavily against Appellant as one of the FBI laboratory reports indicates there is only a one in two quadrillion chance[4] that there would be an individual other than Appellant with a DNA profile that randomly matched the sample DNA obtained in T.L.'s rape kit swabbing. Commonwealth Exhibit 30, FBI Laboratory Report, 9/16/21, at 2. Appellant does not present any evidence to refute or contradict the forensic evidence presented by the Commonwealth.

Given the aforementioned analysis of Appellant's claim according to the **Barker** balancing test, we conclude that the trial court properly exercised its discretion in determining that Appellant's speedy trial rights were not violated.

### Challenge to Denial of Suppression Motion

Lastly, Appellant raises two separate arguments to challenge the trial court's denial of his suppression motion, contending that officers violated

---

[4] One quadrillion is 1,000,000,000,000,000, or a 1 followed by 15 zeros.

Article I, Section 8 of the Pennsylvania Constitution in conducting (1) a warrantless search and seizure of Appellant's trash outside his home and (2) a warrantless search, seizure, extraction and profiling of DNA from items seized from that trash as well as eating utensils that Appellant's son, Z.W., discarded at a public banquet.

Our standard of review in addressing a challenge to a denial of a suppression motion is well settled.

> [Our] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Metz*, 332 A.3d 92, 97–98 (Pa.Super. 2025) (citations omitted).

> Our courts have aptly explained that:
>
> [b]oth the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures by police in areas where individuals have a reasonable expectation of privacy. An expectation of privacy exists if a person has a subjective expectation of privacy that society is willing to recognize as legitimate and reasonable. Where there exists a reasonable expectation of privacy, Article I, Section 8 and the Fourth Amendment generally require police to obtain a warrant, issued by a neutral and detached magistrate and founded upon probable cause, prior to conducting a search or seizure of a person and/or

- 34 -

a person's property, unless one of the few well delineated exceptions apply.

***Commonwealth v. Hall***, 305 A.3d 1026, 1032–33 (Pa.Super. 2023) (citation omitted). To determine whether "a person's expectation of privacy is legitimate or reasonable, we must consider the totality of the circumstances[,] and the determination ultimately rests upon a balancing of the societal interests involved." ***Id.*** (quoting ***Commonwealth v. Kane***, 210 A.3d 324, 329 (Pa.Super. 2019)).

Appellant first argues that officers violated his right to be free from unlawful searches or seizures under Article I, Section 8 in confiscating trash bags left for collection. The trial court found Appellant had no objectively reasonable expectation of privacy in spit bottles he voluntarily abandoned in trash bags outside of his home left for pickup by a private waste-management company. Thus, the trial court determined that the bottles were lawfully seized after they were transferred to the waste-management company.[5]

Appellant acknowledges that the United States Supreme Court has ruled that the Fourth Amendment does not prohibit a "warrantless search and seizure of garbage left for collection outside the curtilage of a home." ***California v. Greenwood***, 486 U.S. 35, 37, 108 S.Ct. 1625, 1627, 100 L.Ed.2d 30 (1988). The Supreme Court provided that "[a]n expectation of

---

[5] Similarly, the trial court found that Appellant's son, Z.W., had no expectation of privacy in eating utensils he threw away in the trash at a public banquet. Further, the trial court emphasized that Appellant could not seek suppression based on another individual's privacy rights. Appellant does not challenge the officers' seizure of Z.W.'s discarded utensils on appeal.

privacy does not give rise to Fourth Amendment protection ... unless *society* is prepared to accept that expectation as objectively reasonable." *Id*. at 39– 40, 108 S.Ct. at 1628 (emphasis added).

The **Greenwood** Court reasoned that the respondents lacked an expectation of privacy in garbage bags left outside the curtilage of their home as "[i]t is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." *Id*. at 40, 108 S.Ct. at 1628–29 (footnotes omitted). The Supreme Court also noted that "respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." *Id.* at 40, 108 S.Ct. at 1629. As such, the Supreme Court determined that the Fourth Amendment allows officers to conduct warrantless searches and seizures of garbage discarded in areas subject to public inspection, as society would not accept as reasonable the respondents' claim to an expectation of privacy in trash left for collection in an area accessible to the public. *Id.* at 41, 108 S.Ct. at 1629.

However, Appellant requests that this Court decide as an issue of first impression that Pennsylvania should depart from federal law and the holding in **Greenwood** and determine that warrantless searches and seizures of trash left for collection outside the curtilage of an individual's home are prohibited by Article I, Section 8. Our state constitutional analysis will be guided by the Pennsylvania Supreme Court's decision in **Commonwealth v. Edmunds**, 526

Pa. 374, 586 A.2d 887 (1991) in that we will examine "(1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania case-law; (3) related case-law from other states; [and] (4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Id.* at 390, 586 A.2d at 895.

The text of the Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The text of Article I, Section 8 of the Pennsylvania Constitution provides as follows:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8.

Appellant has not made any textually-based arguments to assert that the language of Article I, Section 8 should be construed differently than the Fourth Amendment in this context. Article I, Section 8 protects individuals from unreasonable searches and seizures of their "persons, houses, papers, and possessions." Our Supreme Court has interpreted the term "possessions,"

pursuant to the doctrine of *ejusdem generis*, in context with the three preceding terms, all of which generally refer to "intimate things about one's person." ***Commonwealth v. Russo***, 594 Pa. 119, 130–31, 934 A.2d 1199, 1206 (2007). The Supreme Court noted in ***Russo*** that if the term "possessions" was interpreted as everything one owned, there would be no need to specifically delineate separate categories of "houses, papers, and possessions." ***Id.*** Further, there is nothing in the text of Article I, Section 8, that suggests that trash left for collection outside one's home is entitled to the same degree of privacy as one's person, house, papers, and possessions.

Regarding the "history of the provision" prong of the ***Edmunds*** analysis, Appellant generally asserts that our courts have established that Article I, Section 8 embodies "a strong notion of privacy, carefully safeguarded in the Commonwealth for the past two centuries," which has been employed to "guard individual privacy rights against unreasonable searches and seizures more zealously than the federal government does" under the Fourth Amendment. Appellant's Brief (quoting ***Edmunds***, 526 Pa. at 394-98, 586 A.2d at 897-99).

In claiming this Court should extend additional privacy protections to prevent the search and seizure of an individual's trash that is accessible to the public and transferred to a collection company, Appellant argues that our Supreme Court extended heightened privacy protection to bank records in which an individual voluntarily allows to be held by another party. In ***Commonwealth v. DeJohn***, 486 Pa. 32, 49, 403 A.2d 1283, 1291 (1979),

the Supreme Court held that pursuant to Article I, Section 8, bank customers have a legitimate expectation of privacy in records pertaining to their affairs kept at the bank." Appellant relies on *DeJohn* for the proposition that Article I, Section 8 protects an individual's possessions from unreasonable searches and seizures "[s]o long as a person seeks to preserve his effects as private, even if they are accessible to others." *Id.* at 1289.

Although we acknowledge that Article I, Section 8 implicates heightened privacy protections for individuals, we do not believe that bank records, which are by nature confidential, are closely analogous to discarded trash that has been abandoned by its owner. Our long-standing precedent establishes that a defendant does not have standing to contest the search and seizure of items which he has voluntarily abandoned as the defendant has no reasonable expectation of privacy in abandoned items. *Commonwealth v. Byrd*, 987 A.2d 786, 790 (Pa.Super. 2009) (citations omitted); *Commonwealth v. Shoatz*, 469 Pa. 545, 553, 366 A.2d 1216, 1220 (1976)). Our courts have set forth the following analysis to determine whether an abandonment has occurred:

> [a]bandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. The issue is not abandonment in the strict property-right sense, *but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.*

*Byrd*, 987 A.2d at 791 (*quoting Shoatz*, 469 Pa. at 553, 366 A.2d at 1220).

In **Shoatz**, our Supreme Court found that defendants abandoned suitcases they had dropped while fleeing from police as they "relinquish[ed] both control of the luggage as well as any expectation of maintaining the privacy of its contents." **Shoatz**, 469 Pa. at 553, 366 A.2d at 1220.

This Court has consistently held that the heightened privacy protections in Article I, Section 8 do not apply to abandoned property. In **Commonwealth v. Kane**, 210 A.3d 324, 329-30 (Pa.Super. 2019), this Court found that officers were authorized to conduct a warrantless search and seizure of a cell phone that was discovered in a university dormitory bathroom that was actively recording individuals using the toilet. The appellant, who was determined to be the owner of the cell phone, challenged the legality of the search pursuant to the Fourth Amendment and Article I, Section 8. The Superior Court upheld the trial court's denial of the appellant's motion, finding that "once [the a]ppellant voluntarily abandoned his cell phone in a public bathroom, he abandoned any legitimate expectation of privacy in its contents." **Id.** at 331.

Although Pennsylvania courts have not expressly determined whether warrantless trash pulls are permitted under Article I, Section 8, this Court has consistently characterized an individual's decision to place trash out for pickup as an act of abandonment. In **Commonwealth v. Minton**, 432 A.2d 212, 217 (Pa.Super. 1981), a decision that predated the U.S. Supreme Court's decision in **Greenwood**, this Court determined that "placing trash for collection is an act of abandonment which terminates any [F]ourth

[A]mendment protection." *Id.* *See also Commonwealth v. Perdue*, 564 A.2d 489, 492 (Pa.Super. 1989) (finding the appellant had no reasonable expectation of privacy in items he abandoned in the garbage can next to parsonage); *Commonwealth v. Cihylik*, 486 A.2d 987, 990-91 (Pa.Super. 1985) (appellant did not have any reasonable expectation of privacy in discarded trash as he demonstrated intent to abandon contents of trash pit beside a barn on leased property).

We highlight the decision in *Commonwealth v. Bagley*, 596 A.2d 811 (Pa.Super. 1991) in which this Court determined that a defendant's act of discarding items in the trash outside his home "manifested a clear intention to abandon any reasonable expectation of privacy in such property." *Id.* at 819. Although this Court did not explicitly determine whether the officers' warrantless search of the appellant's trash violated Article I, Section 8, it referenced this constitutional section in multiple instances in the decision.

Turning to third prong of the *Edmunds* analysis, we analyze related case law from other states. Appellant asks this Court to adopt the holdings of other jurisdictions that have departed from the United States Supreme Court's decision in *Greenwood* and found that an individual has a protectable privacy interest in trash left out for collection by a private trash removal company.

First, Appellant cites *State v. Granville*, 142 P.3d 933 (N.M. 2006) in which the New Mexico Court of Appeals recognized an individual's right to privacy in sealed garbage left for collection in an alley behind a single-family home, finding that "[t]he contents of a person's garbage are evidence of his

most private traits and intimate affairs." *Id*. at 941. Appellant notes that the *Granville* court rejected any suggestion that an individual has no expectation of privacy in their garbage bags simply because they are accessible to the public and are given to third party collectors as it reasoned that "unconstrained government inspection of people's trash is not consistent with a free and open society." *Id*. at 944 (citation omitted).

Next, Appellant notes that the *Granville* court relied heavily on the decision in *State v. Hempele*, 576 A.2d 793 (N.J. 1990), in which the New Jersey Supreme Court found that a warrantless search of curbside garbage violated its state constitution. The *Hempele* court reasoned that an individual has a reasonable expectation of privacy in keeping his or her garbage private as "[a]lmost every human activity ultimately manifests itself in waste products[,] and … any individual may understandably wish to maintain confidentiality of his refuse." *Hempele*, 576 A.2d at 802. Further, the *Hempele* court determined that individuals do not "compromise their privacy interest" in their trash when they entrust a trash collector to dispose of their trash bags. *Id.* at 806.

Appellant also cites *State v. Galloway*, 109 P.3d 383 (Or.App. 2005), *State v. Morris*, 680 A.2d 90 (Vt. 1996), and *State v. Tanaka*, 701 P.2d 1274 (Haw. 1985) for the proposition that individuals have a reasonable expectation of privacy in their sealed garbage bags as they do not "implicitly authorize anyone else to paw through their garbage and view and take items of garbage," but rather, expect that "only the garbage collection company []

would remove the bags from the cans and carry them away." ***Galloway***, 109 P.3d 388. ***Id***. ***See also Morris***, 680 A.2d at 96 (individuals expect that their curbside garbage "will be collected, taken to the landfill, and commingled with other garbage without being intercepted and examined by police"); ***Tanaka***, 701 P.2d at 1276 (finding "people reasonably believe that police will not indiscriminately rummage through their trash bags to discover their personal effects").

Further, Appellant notes that courts in California, New Hampshire, North Carolina, and Washington have also determined that an individual has a reasonable expectation of privacy in trash left out for pickup by a private collection company. ***State v. Goss***, 834 A.2d 316, 319-20 (N.H. 2003); ***State v. Boland***, 800 P.2d 1112, 1113 (Wash. 1990); ***People v. Krivda,*** 486 P.2d 1262 (Cal. 1971) (*en banc*), *vacated*, 409 U.S. 33, 93 S.Ct. 32, 34 L.Ed.2d 45 (1972) (remanding for a determination of whether holding was based on federal or state law), 504 P.2d 457 (Cal. 1973) (confirming state constitution furnished independent ground for decision); ***State v. Rhodes***, 565 S.E.2d 266, 267 (N.C.App. 2002), *appeal denied*, 569 S.E.2d 273 (N.C. 2002).

Although these cases do support Appellant's position, the majority of other jurisdictions have adopted the United States Supreme Court's holding in ***Greenwood*** which authorizes warrantless searches of trash bags left curbside for collection. Courts in Connecticut, Colorado, and Delaware have determined that warrantless seizures of trash are permitted under their state constitutions

which contain provisions that are nearly identical to Article I, Section 8 of the Pennsylvania Constitution and provide greater privacy protection.

In **State v. DeFusco**, 620 A.2d 746 (Conn. 1993), the Connecticut Supreme Court held that Article I, Section 7 of the Connecticut Constitution which "provides broader protection of individual rights than does the federal constitution," does not require officers to obtain a warrant to search and seize trash bags placed at the curb for collection in which there is no reasonable expectation of privacy. **Id.** at 749-753; Conn. Const. art. I, § 7. Similarly, the Colorado Supreme Court held in **People v. Hillman**, 834 P.2d 1271 (Colo. 1992) that Article II, Section 7 of the Colorado Constitution does not prohibit the warrantless search and seizure of garbage left at the curb for collection as there is no reasonable expectation of privacy in such garbage which is readily accessible to the public. **Id.** at 1276-78; Colo. Const. art. II, § 7.

Notably, the Delaware Court of Appeals examined Pennsylvania's Article I, Section 8 and applicable precedent in determining that its own state constitution permitted the warrantless seizure of trash bags. **State v. Ranken**, 25 A.3d 845 (Del.Super.Ct. 2010), *affirmed*, 21 A.3d 597 (Del. 2011). The Delaware Superior Court noted that its own applicable constitutional provision is nearly textually identical to Article I, Section 8, and both reflect a higher standard of commitment in protecting the privacy of their citizens than that of the U.S. Constitution. **Id**. at 853-54 (citing Del. Const. art. I, § 6). The Delaware Superior Court emphasized that this Court had determined in **Bagley** that the defendant had abandoned any reasonable

expectation of privacy of trash put outside his house. While the **Ranken** Court conceded that it was uncertain whether **Bagley** was decided on state constitutional grounds pursuant to Article I, Section 8 of the Pennsylvania Constitution, it noted that the **Bagley** court's references to this constitutional provision in multiple points in the opinion "strongly suggests that it saw no violation of the provision." **Id**. at 856.

Moreover, numerous other jurisdictions have determined that warrantless seizures of trash are permitted under their state constitutions. **See State v. Frye**, 108 N.E.3d 564, 584 (Ohio 2018); **State v. McMurray**, 860 N.W.2d 686, 693 (Minn. 2015); **Barekman v. State**, 200 P.3d 802, 809-810 (Wyo. 2009); **State v. 1993 Chevrolet Pickup**, 116 P.3d 800, 805 (Mont. 2005); **Litchfield v. State**, 824 N.E.2d 356, 363-64 (Ind. 2005);[6] **State v. Schwartz**, 689 N.W.2d 430, 435-36 (S.D. 2004); **Rikard v. State**, 123 S.W.3d 114, 119-20 (Ark. 2003); **State v. Donato**, 20 P.3d 5, 8-10 (Id. 2001); **Commonwealth v. Carriere**, 545 N.W.2d 773, 776 (N.D. 1996); **Commonwealth v. Pratt**, 555 N.E.2d 559, 567-68 (Mass. 1990); **State v. Stevens**, 367 N.W.2d 788, 797 (Wis. 1985); **State v. Jackson**, 937 P.2d

---

[6] Notably, the Indiana Supreme Court qualified its holding to indicate that a warrantless search and seizure of trash left for collection would be deemed reasonable if the officers retrieved the trash "in substantially the same manner as the trash collector would take it" and were able to establish articulable reasonable suspicion to do so. **Litchfield,** 824 N.E.2d at 363-64. **See also Beltz v. State**, 221 P.3d 328 (Alaska 2009) (adopting **Litchfield** analysis and noting that "a garbage search is a sufficiently minimal intrusion on privacy expectations to require only reasonable suspicion that the trash contains evidence of a crime causing serious harm to persons or property").

545, 549-50 (Utah Ct. App. 1997), *cert denied*, 945 P.2d 1118 (Utah 1997); ***People v. Thivierge***, 435 N.W.2d 446, 447 (Mich.App. 1988), *appeal denied* (May 31, 1989); ***Cooks v. State***, 699 P.2d 653, 656 (Okla.Crim.App. 1985), *cert denied*, 106 S. Ct. 268 (Okla. 1985).

Appellant does not specifically address the final ***Edmunds*** factor but suggests a policy consideration supporting the prohibition of warrantless trash searches is that individuals have "no realistic option but to arrange for trash disposal" at the curbside of their residence. Appellant's Brief, at 79.

While Appellant has raised a valid concern, we are more persuaded by prevailing Pennsylvania law in which our courts have repeatedly held that an individual's decision to voluntarily discard items in trash bags left for collection "manifest[s] a clear intention to abandon any reasonable expectation of privacy in such property." ***See Bagley***, ***supra***, ***Perdue***, ***supra***, ***Cihylik***, ***supra***, ***Minton***, ***supra***. Individuals relinquish any reasonable expectation of privacy in trash once it is left for collection by third party waste management companies in an area accessible to the public.

In response to Appellant's claim that police should not be permitted access to a citizen's trash bags which may contain personal or confidential information, we find persuasive the rationale set forth by the United States Supreme Court in ***Greenwood*** and the Supreme Court of Connecticut in ***DeFusco*** in observing the following:

> [it is a] matter of common knowledge that garbage placed at the curb is subject to intrusion by a variety of people, with a variety of purposes, including bottle and coupon collecting, antique

hunting, food searching and snooping. Finally, we regard it to be common knowledge among citizens of this state that dogs, raccoons, or other creatures may intrude upon and expose the contents of garbage that has been placed for collection in an accessible area.

In light of our recognition of these potential intrusions on garbage placed at the curb for collection, the defendant's argument for state constitutional protection against police searches of his garbage devolves into an argument that a person may harbor different expectations of privacy, all of which are reasonable, as to different classes of intruders. We cannot countenance such a rule. A person's reasonable expectations as to a particular object cannot be compartmentalized so as to restrain the police from acting as others in society are permitted or suffered to act. A person either has an objectively reasonable expectation of privacy or does not; what is objectively reasonable cannot, logically, depend on the source of the intrusion on his or her privacy.

*DeFusco*, 620 A.2d 746, 752–53 (citing *Greenwood*, *supra*) (other citations and footnotes omitted).

Specifically, in this case, officers recovered Appellant's trash bags that were left curbside for pickup after they had been collected by a third-party waste management company and held separately by sanitation workers who drove down the street and subsequently turned the trash bags over to the police. N.T. 12/19/22, at 153-155. We find Appellant's alleged expectation of privacy in trash he voluntarily discarded for pickup by a third-party collection company is not one that society is prepared to accept as reasonable. As a result, the trial court did not err in determining that the officers' warrantless search of Appellant's trash bags did not violate his rights under Article I, Section 8 of the Pennsylvania Constitution.

Lastly, we evaluate Appellant's alternative claim that the officers were not permitted to conduct a warrantless extraction and analysis of DNA evidence obtained from Appellant's trash and from eating utensils that Appellant's son, Z.W., discarded at a public banquet. Appellant claims that the processing of the DNA itself constitutes its own separate search from the physical collection of the items. Appellant argues that individuals do not voluntarily abandon their DNA in shedding genetic material, such as skin cells, hair, and saliva, which reveals deeply personal information. As such, Appellant argues that DNA testing cannot be performed without a warrant as it infringes on a reasonable privacy interest in his "bodily integrity and genetic information." Appellant's Brief, at 88.

Although this Court has not directly addressed whether the Commonwealth is required to obtain a warrant to perform DNA analysis on abandoned items, Appellant cites to this Court's decision in **Commonwealth v. Smith**, 164 A.3d 1255 (Pa.Super. 2017) for the proposition that police may only perform warrantless DNA analysis on items obtained from arrestees and pretrial detainees after it has been determined that there is probable cause to believe the arrestee committed a crime.

Appellant has mischaracterized this Court's decision in **Smith**, which actually undermines the arguments he is trying to make. In **Smith**, the appellant sought suppression of DNA testing performed on his blood-stained shoes and shirt that officers confiscated upon his arrest and the execution of a search warrant. Smith argued that while the items were lawfully seized, the

extraction and analysis of the DNA samples represented an additional search that required a warrant as DNA can "reveal physiological data and a host of private medical facts" and "intrude on expectations of privacy that society has long recognized as reasonable." *Id.* at 1257-58.

The *Smith* Court determined that officers were permitted to conduct warrantless DNA analysis on items seized from an arrestee as a "DNA sample of the accused taken upon arrest, while more revealing, is no different in character than acquiring fingerprints upon arrest." *Id.* at 1260 (citing *U.S. v. Mitchell*, 652 F.3d 387, 410-12 (3rd Cir. 2011) (other citations omitted)). This Court found that Smith had failed to demonstrate a "protectable privacy interest in the DNA samples taken from his shirt and shoe prior to their analysis." *Id.* While this Court recognized that DNA evidence has the potential to reveal sensitive information, the prosecution's purpose in DNA testing is to determine the identity of the source by comparing two DNA samples to evaluate whether they match. This Court found it was mere speculation for Smith to argue that the government would use his DNA sample to obtain private medical information. *Id.*

Appellant asks us to construe the *Smith* decision to hold that officers may only perform warrantless DNA analysis on items seized from an arrestee, felon, or parolee. However, this argument completely misses the mark as the *Smith* court only addressed whether police may conduct DNA analysis on items obtained incident to arrest or may compel arrestees to submit to DNA testing for identification purposes. In this case, the key issue is whether police

need a warrant to extract DNA from *abandoned* items that were lawfully obtained. We reiterate that an individual has no standing to contest the search and seizure of items which he has voluntarily abandoned as the defendant has no reasonable expectation of privacy in such items. **Byrd**, **supra**.

We also reject Appellant's suggestion that he is entitled to relief based on his assertion that an individual does not *voluntarily* abandon their DNA. We find persuasive the logic set forth in **State v. Athan**, 158 P.3d 27, 37 (Wash. 2007) in concluding that individuals cannot claim an expectation of privacy in discarded genetic material.

In **Athan**, officers suspected that Athan was the perpetrator of the 1982 rape and murder of a 13-year old girl. After the officers were able to develop a DNA profile for the perpetrator decades later from evidence obtained from the crime scene, they attempted to obtain a DNA sample from Athan by posing as attorneys inviting him to join a fictitious class action. Detectives were able to analyze DNA from saliva Athan used to seal a mailed letter in which he expressed a desire to be part of the class action. Athan's DNA was a match to the DNA found at the crime scene of the 1982 rape and murder.

The Washington Supreme Court ruled that "[t]he analysis of DNA obtained without forcible compulsion and analyzed by the government for comparison to evidence found at a crime scene is not a search under the Fourth Amendment." **Athan**, 158 P.3d at 37. Thus, the **Athan** court specifically found that Athan had no expectation of privacy in his saliva used

to seal an envelope that he placed in the mail.  Further, the **Athan** court aptly

noted that:

> [p]olice may surreptitiously follow a suspect to collect DNA, fingerprints, footprints, or other possibly incriminating evidence, without violating that suspect's privacy. No case has been cited challenging or declaring this type of police practice unreasonable or unconstitutional. People constantly leave genetic material, fingerprints, footprints, or other evidence of their identity in public places. *There is no subjective expectation of privacy in discarded genetic material just as there is no subjective expectation of privacy in fingerprints or footprints left in a public place.* Physical characteristics which are exposed to the public are not subject to Fourth Amendment protection. **United States v. Mara**, 410 U.S. 19, 21, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973).

*Id.* (emphasis added).

The Supreme Court of Maryland has similarly held that:

> [the] DNA testing of ... genetic material, not obtained by means of a physical intrusion into the person's body, is no more a search for purposes of the Fourth Amendment, than is the testing of fingerprints, or the observation of any other identifying feature revealed to the public-visage, apparent age, body type, skin color.

**Raynor v. State**, 99 A.3d 753, 767 (Md. 2014).  **See also State v. Vannieuwenhoven**, 8 N.W.3d 63, 73 (Wis.Ct.App. 2024) (finding officers did not need warrant to extract DNA from items lawfully obtained by law enforcement when the only purpose of the analysis was to compare the perpetrator sample with the sample obtained from the crime scene); **State v. Burns**, 988 N.W.2d 352, 364-65 (Iowa 2023) (warrantless DNA analysis on a drinking straw discarded by a suspect at a restaurant deemed lawful); **State v. Williford**, 767 S.E.2d 139, 144 (N.C.Ct. App. 2015) (warrantless

extraction of DNA from cigarette butt discarded by the defendant on the ground of a parking lot did not constitute a search).

Consistent with the logic set forth by our sister states, we conclude individuals do not have an expectation of privacy in discarded genetic material. More specifically, we conclude that Appellant did not have an expectation of privacy in his saliva discovered inside of discarded spit bottles that were lawfully confiscated by police.

To the extent that Appellant challenges the officers' extraction and analysis of DNA from utensils that his son, Z.W., discarded at a public banquet, we emphasize that Appellant could not establish an expectation of privacy in another person's DNA sample. **See Smith**, 164 A.2d at 1260 (defendant could not establish privacy interest in DNA samples as they were determined to belong to the victim of the relevant crime).

Accordingly, the trial court did not err in denying Appellant's motion to suppress the items obtained in trash bags left for collection and the DNA found in items voluntarily discarded by Appellant and his son, Z.W.

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>07/24/2025</u>